# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DONALD JOHN SCANLON,⁣    )
    )
    Petitioner,    )    MEMORANDUM OPINION
    )    AND RECOMMENDATION
    v.    )
    )
SID HARKLEROAD, Admin.,    )    1:07CV498
Marion Correctional Inst.,    )
    )
    Respondent.    )

This matter is before the court on motions by both parties for summary judgment (docket nos. 10, 17).  Each party has responded to the other's motion, and the matter is ripe for disposition.  Furthermore, the parties have not consented to the jurisdiction of the magistrate judge; therefore, the motions must be dealt with by way of recommendation.  For the following reasons, it will be recommended that Respondent's motion for summary judgment be granted, that Petitioner's motion for summary judgment be denied, and that the habeas petition be dismissed.

## THE STATE COURT PROCEEDINGS

On March 18, 1996, Petitioner was indicted by the Durham County Grand Jury on charges of first-degree murder, felonious breaking or entering, felonious larceny of credit cards and a motor vehicle and felonious possession of stolen goods.  The State gave notice that it would seek the death penalty, and, on June 14, 1996, Brian Aus and Lee R. Castle were appointed to represent Petitioner.

Petitioner was tried and convicted of all charges, including the first-degree murder charge, at the May 7, 1998, Criminal Session of the Durham County Superior Court. The jury returned its verdicts on June 3, 1998. The sentencing phase of the trial began on June 4, 1998, and both the State and Petitioner presented additional evidence. On June 9, 1998, the jury returned its recommendation that Petitioner be sentenced to death. Judge Ronald Stephens entered judgment imposing the death penalty. On the remaining counts, Judge Stephens consolidated judgment and sentenced Petitioner to two consecutive terms of ten to twelve months imprisonment. Petitioner gave notice of appeal of right to the North Carolina Supreme Court in open court.

On May 5, 2000, Petitioner, through counsel, Assistant Appellate Defender Janet Moore, filed a Motion for Appropriate Relief ("MAR") in the North Carolina Supreme Court, pursuant to N.C. GEN. STAT. §§ 15A-1415(b)(3) and 15A-1418(a). In his MAR, the Petitioner raised two issues:

> 1. The prosecutors at trial made numerous misrepresentations that minimized the severity of the medical condition of [the victim], whose medical records indicated that before her death she had a history of complaints and treatment for anxiety, depression, and a heart condition complicated by a number of risk factors; and

> 2. Petitioner received ineffective assistance of counsel from his trial attorneys in violation of *Strickland v. Washington*, 466 U.S. 668 (1984), because his counsel had access to [the victim's] medical records before trial, but never presented the records to any medical expert for review, never corrected the prosecutors' alleged misrepresentations about [the victim's] medical conditions and never "brought the truth to the attention of either the Medical Examiner or Defendant's capital jury."

The State filed its answer to the MAR on May 12, 2000.

On June 15, 2000, the North Carolina Supreme Court remanded Petitioner's MAR to Durham County Superior Court for an evidentiary hearing. *State v. Scanlon*, 352 N.C. 155, 544 S.E.2d 241 (2000). Thomas F. Loflin, III and Kevin Bradley were appointed to represent Petitioner in the MAR proceeding.

On June 12, 2001, Petitioner filed amendments to his MAR (First Amendments) in both the North Carolina Supreme Court and Durham County Superior Court. In his first amendments, Petitioner attempted to raise additional claims of ineffective assistance of counsel, including that trial counsel had: (a) neglected to challenge four jurors whose statements during *voir dire* disclosed a substantial probability of prosecution bias; (b) neglected to utilize Ms. Harris's medical records to correct the prosecutors' misrepresentation of the medical condition of Ms. Harris before her death and to call into question whether Ms. Harris died as a result of homicide; (c) neglected to provide the pathologist called by the defense with information and documentation necessary to support the defenses raised at trial; (d) neglected to call attention to evidence supporting defenses raised at trial or contradicting the prosecutors' assertions; (e) neglected to object to material misrepresentations by the prosecutors or to correct those misrepresentations by calling attention to the true state of the evidence; (f) neglected to request a jury instruction on accident as a complete defense to first-degree murder; (g) neglected to except to the Superior Court's erroneous re-instruction of the elements of first-

degree murder or to request a correct re-instruction; and (h) neglected to provide the psychologist called by the defense with information and documentation necessary to mitigate the homicide.

On August 2, 2001, Judge Stephens entered an order concluding that Petitioner "lacked jurisdiction" to raise matters beyond the scope of the remand order from the North Carolina Supreme Court. On November 30, 2001, Petitioner filed in the North Carolina Supreme Court second amendments to the MAR, together with a motion to remand both the first and second amendments to the Superior Court for consideration at the evidentiary hearing on his MAR. In the second amendments, Petitioner added the following allegations: (a) the prosecutors violated his state and federal constitutional rights by misrepresenting the medical condition of Ms. Harris before her death and the circumstances surrounding her death despite knowing the facts which called into question whether Ms. Harris died as a result of homicide; (b) the prosecutors violated Petitioner's state and federal constitutional rights by suppressing exculpatory evidence contradicting their presentation and arguments to the jury; and (c) Petitioner received ineffective assistance of counsel in that appointed trial counsel neglected to conduct either a reasonable investigation or reasonable cross-examination which would have revealed the facts suppressed by the prosecution. The State responded on January 7, 2002, opposing Petitioner's motion as to the first amendments, but not to the second.

On August 15, 2002, the North Carolina Supreme Court granted Petitioner's motion to remand.[1] *State v. Scanlon*, 356 N.C. 174, 569 S.E.2d 274 (2002). On the first day of the evidentiary hearing on the MAR, October 21, 2002, Judge Stephens ruled that he would address all of the allegations raised by Petitioner in his first and second amendments except that trial counsel (a) neglected to challenge four jurors whose statements during *voir dire* disclosed a substantial probability of bias in favor of the prosecution; (f) neglected to request a jury instruction on accident as a complete defense to first-degree murder; (g) neglected to except to the Superior Court's erroneous re-instruction of the elements of first-degree murder or to request a correct re-instruction; and (h) neglected to provide the psychologist called by the defense with information and documentation necessary to mitigate the homicide.

The evidentiary hearing was held before Judge Stephens in October and November 2002. On February 25, 2004, Judge Stephens entered a Memorandum Opinion and Order in which he granted Petitioner a new capital sentencing proceeding due to ineffective assistance of counsel but denied Petitioner relief as to the guilt phase of his trial. By separate order dated March 19, 2004, Judge Stephens prohibited attorneys Aus and Castle "from any further representation of

---

[1] The parties disagree as to whether the remand order addressed Petitioner's motion as to his first amendments. The order itself reads: "Motion by Defendant to Remand Amendments and Second Amendments to Motion for Appropriate Relief has been filed and the following order entered:

'Motion Allowed by order of the Court in conference this the 15th day of August 2002.'"

any indigent defendant charged with First Degree Murder who faces the possibility of a death sentence or anyone convicted of First Degree Murder who is challenging his death verdict in a Motion for Appropriate Relief." (Pet. Add'l Grounds for Relief, App. A).

Petitioner thereafter filed several motions and requests in the North Carolina Supreme Court, seeking a new trial, immediate and expedited review, and other similar relief. The state supreme court denied Petitioner's various requests.

On August 23, 2004, pursuant to N.C. GEN. STAT. § 15A-2004(d), the State elected not to seek the death penalty against Petitioner, and Judge Stephens resentenced him to life imprisonment without parole. Petitioner, in open court, gave notice of appeal of right to the North Carolina Court of Appeals.

Petitioner raised the following claims in his brief on appeal in the North Carolina Court of Appeals:

I.      There was insufficient evidence to support Petitioner's murder and property-offense convictions;

II.     The trial court erred in its charge to the jury by denying Petitioner's request for an involuntary manslaughter instruction, failing to instruct on accident, and giving an erroneous re-instruction on murder;

III.    The prosecution participated in misconduct by suppressing, misrepresenting, and sequestering evidence, and arguing improperly during closing arguments;

IV.     He received ineffective assistance of counsel;

V.      The trial court erred in allowing the admission of unreliable hearsay evidence;

6

VI.     There was improper juror-witness contact; and

VII.    His murder indictment was inadequate.

(Resp. Ex. 2.)  In a unanimous, published opinion filed March 7, 2006, the North

Carolina Court of Appeals affirmed Petitioner's convictions and sentences, in part,

but vacated the felonious possession charges as being duplicitous with the

convictions for felonious larceny.  *State v. Scanlon*, 176 N.C. App. 410, 626 S.E.2d

770 (2006).

On April 11, 2006, Petitioner filed a notice of appeal, alleging that there was

a substantial constitutional question, and petition for discretionary review in the North

Carolina Supreme Court, seeking review of those portions of the North Carolina

Court of Appeals' opinion affirming his convictions and sentences.  In his request for

review, Petitioner raised the following issues:

I.      There was insufficient evidence to support Petitioner's murder
        conviction, as to the cause, manner, and time of death;

II.     He received ineffective assistance of counsel;

III.    The prosecution participated in misconduct by suppressing
        evidence of [Claudine Wilson] Harris's drug use, complete
        disability for severe depression and heart diseases, material
        impeachment evidence; and by misrepresenting her health;

IV.     The trial court erred in not instructing the jury on accident and
        voluntary manslaughter and further erred when it re-instructed
        the jury on murder;

V.      The trial court erred in admitting inadmissible hearsay;

VI.     The prosecution participated in misconduct by improperly
        arguing during closing arguments and tainting evidence;

7

VII.    There was improper juror-witness contact;

VIII.   The MAR court's fact-finding contradicted the evidence;

IX.     His right to a unanimous verdict was violated;

X.      There was cumulative error of prosecutorial misconduct, ineffective assistance of counsel, and other errors in the case; and

XI.     The indictment was inadequate.

(Resp. Ex. 7.)  On April 24, 2006, the State filed a motion to dismiss Petitioner's appeal and a response to the petition for discretionary review.  The North Carolina Supreme Court granted the State's motion to dismiss and denied the petition for discretionary review on June 29, 2006.  *State v. Scanlon*, 635 S.E.2d 52 (N.C. 2006).

On June 27, 2007, Petitioner filed, through counsel Ms. Moore, his Petition for Writ of Habeas Corpus with this court.  Respondent timely filed its answer to the petition.  On October 10, 2007, Respondent filed a motion for summary judgment (docket no. 10), to which Petitioner responded on December 13, 2007 (docket no. 16).  Also on December 13, 2007, Petitioner filed a motion for summary judgment (docket no. 17).  Respondent filed a response on December 21, 2007 (docket no. 21).

8

# THE CLAIMS OF THE HABEAS CORPUS PETITION[2]

Petitioner presents the following claims in his habeas petition:

I.      Ineffective assistance of counsel.

II.     Prosecutorial misconduct.

III.    Confrontation clause violation.

IV.    Failure to instruct on accident as complete defense to first-degree murder charge.

V.     Failure to instruct on involuntary manslaughter.

VI.    Insufficiency of the evidence.

VII.   Inadequate murder indictment.

VIII.  Cumulative error and violation of fair trial.

## FACTUAL BACKGROUND

### A.  Facts underlying conviction

The North Carolina Court of Appeals summarized the evidence presented at Petitioner's trial as follows:

> Defendant worked for Claudine Wilson Harris as a handyman from October 1995 through January 1996.  Defendant lived at Ms. Harris's residence until she discovered that he had been misusing her credit cards and forging checks on her checking account.  After Ms. Harris evicted Defendant from her home and sought to take out warrants

---

[2]  The first four grounds listed below are contained in the original section 2254 petition. Petitioner also attached to the petition an eighty-two page document titled "Additional Grounds for Relief and Facts Supporting Petition for Writ of Habeas Corpus."  This document contains four additional grounds for relief along with extensive factual statements in support of all eight claims.  This document will be referred to as "Pet., Attach. at ___."

9

against him, Defendant threatened to kill her. Ms. Harris told her sister, Barbara Breeden, that she feared that Defendant had a key to her home and she felt that she should have the locks changed. Ms. Harris never changed the locks to her residence; however, as a result of her fears for her own safety, Ms. Harris's nephew, Carlos Breeden, and his girlfriend came to live with her at the end of January 1996.

At around 9:00 p.m. on 27 February 1996, Carlos Breeden found Ms. Harris's body in her bed with a plastic bag wrapped around her head and tied in a knot. Ms. Harris's sweatshirt was pushed up, revealing her underclothes, and her sweat pants and under pants were partially pulled down. Near her bed was a soup can punched with holes, described as a pipe for smoking controlled substances, and a torn-up letter to Defendant expressing her feelings for him. A toxicology report revealed that she had cocaine metabolites in her blood.

On 10 March 1996, authorities arrested Defendant in Syracuse, New York (on unrelated charges) and found in his possession several of Ms. Harris's credit cards, as well as a blank check from Ms. Harris's business checking account. The arresting officers also seized pieces of paper containing Ms. Harris's address, date of birth, social security number, and her First Union checking account number. Meanwhile, in New Orleans, where Defendant admittedly abandoned Ms. Harris's car a few days before, police officers found three keys in the car, none of which fit the lock to Ms. Harris's home.

> . . . .

At trial, Dr. Robert Thompson, the forensic pathologist who supervised the autopsy of Ms. Harris, testified that the cause of her death was asphyxiation. Dr. Thompson further testified that the manner of Ms. Harris's death was homicide based upon information he received from investigating police officers, including that she was found in her bed at home with a plastic bag wrapped and tied around her head; sheets and blankets were piled on top of her body on the bed; certain items in her house had been disturbed; and, her car had been stolen.

Dr. Lawrence Harris, the defense forensic pathologist, testified that Ms. Harris died of a cocaine-induced coronary blockage during attempted sexual asphyxiation. He based this opinion on the plastic bag, cocaine metabolites, "new clots" blocking the bypass artery in Ms. Harris's heart, her disarranged clothing, and the round bed where her body was

10

discovered.  On cross-examination, Dr. Harris admitted that he never reviewed Ms. Harris's medical records or spoke to her doctor prior to testifying.  He also testified on cross-examination regarding evidence showing that Ms. Harris was found underneath a "mountain of covers" with a plastic bag wrapped and tied in a knot around her head that "[s]omeone else did that.  I don't believe she did that."

The State further presented evidence to show that Defendant's DNA was found on a cigarette butt in one of the rooms upstairs, near Ms. Harris's bedroom.  Carlos Breeden testified that the cigarette butt was not present on 25 February 1996, the day before the State contends Ms. Harris was murdered.  The State presented other forensic evidence, including head hair microscopically consistent with Defendant's found on the bed comforter and pillow case on the bed where Ms. Harris's body was discovered, and one of Defendant's pubic hairs on a bed cover near Ms. Harris's body.

*Scanlon*, 176 N.C. App. at 415-17, 626 S.E.2d at 775-76 (2006).[3]

## DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial.  *Matsushita Elec. Indus. Co. v.*

---

[3]  Additional facts will be discussed as pertinent to individual issues.

11

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

It is too glib, however, simply to say that the standard formulation for assessing summary judgment in the run-of-the-mill civil case applies in all habeas cases. For example, the usual summary judgment analysis contemplates accepting the evidence and all justifiable inferences from the evidence in the light most favorable to the non-movant. In the habeas context, however, if there is a contention that the evidence at trial does not support the underlying conviction, the appropriate standard calls for viewing the evidence in the light most favorable to the prosecution and according the prosecution the benefit of all reasonable inferences from the evidence, and in that light, determining if any rational trier of fact could have found

12

the petitioner guilty beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

By way of another example,  in a habeas claim of ineffective assistance of counsel, a federal court "must indulge a strong presumption that counsel's conduct was reasonable, and . . . the petitioner must overcome the presumption that the challenged conduct may have been sound trial strategy."  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  Nevertheless, the point is that habeas cases are subject to a summary judgment analysis as are all civil cases.  *See* Rule 11, Rules Governing Section 2254 Cases In The United States District Courts;  *see also Maynard v. Dixon*, 943 F.2d 407, 412-13 (4th Cir. 1991) (FED. R. CIV. P. 56 applies to habeas proceedings); *but cf.* 17A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4268 (2d ed. 1988) ("The procedure of applications for habeas corpus for state prisoners is a confusing amalgam, to be found in a variety of different sources.  There are a number of procedural provisions in the habeas corpus statutes themselves.").

### B.  Section 2254

Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2000). In addition, factual determinations made by a state court are afforded a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1).

Section 2254 precludes *de novo* federal habeas corpus review of state court decisions on the merits of a petitioner's claim. *Bell v. Jarvis*, 236 F.3d 149,159-60 (4th Cir. 2000) (en banc) (overruling *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir. 1998)). When faced with a state court decision that does not explicitly cite or apply federal law, the habeas court should conduct an "independent examination of the record and the clearly established Supreme Court law." *Bell,* 236 F.3d at 158. Nevertheless, the habeas court must still confine its review to whether the "result" of the state court decision "is legally or factually unreasonable." *Id.* at 163 (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases-- indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the *result* of the state-court decision contradicts them." (first emphasis in original, second emphasis added)).

A state court decision is contrary to Supreme Court precedent if it arrives at a conclusion opposite that of the Supreme Court on a question of law or decides the case differently from Supreme Court precedent based on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court

14

decision is an unreasonable application of Supreme Court law "when a state-court decision unreasonably applies the law of [the Supreme] Court to the facts of a prisoner's case."   *Id.* at 409.   The "unreasonable application" standard does not admit of easy definition.   For example, Justice O'Connor, writing for a majority of the Court, has said that "[t]he term 'unreasonable' is no doubt difficult to define." *Williams*, 529 U.S. at 410.   Nevertheless, more recently the Supreme Court has said that the

> unreasonable application prong of § 2254(d)(1) permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case.   In other words, a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced.   In order for a federal court to find a state court's application of our precedent unreasonable, the state court's decision must have been more than incorrect or erroneous.   The state court's application must have been objectively unreasonable.

*Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (citations omitted); *see also Penry v. Johnson*, 532 U.S. 782, 793 (2001) (stating that even if the habeas court determines that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if the application was also objectively unreasonable); *Williams*, 529 U.S. at 410 (stating that an *unreasonable* application of federal law is different from an *incorrect* application of federal law).   Even if the state court's adjudication is contrary to or an unreasonable application of Supreme Court precedent, a federal habeas court may not grant relief unless the constitutional

15

error "had substantial and injurious effect or influence in determining the jury's verdict." *Penry*, 532 U.S. at 795 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  While the AEDPA standard is difficult to overcome, "[t]he standard is demanding but not insatiable . . . '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke* ("*Miller-El II*"), 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003)).  These standards will guide the analysis below.

### C. Claim I: Ineffective Assistance of Counsel

In his first claim, Petitioner raises numerous contentions of ineffective assistance of counsel.  To prove a Sixth Amendment violation and succeed on a claim of ineffective assistance, a petitioner must first demonstrate "that counsel's performance was deficient" in that it "fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88.  Second, the petitioner must show that the deficient performance prejudiced the defense.  In other words, a petitioner must show that counsel's performance fell below objective standards of reasonableness, and that but for counsel's performance, there was a reasonable probability the outcome of the trial would have been different.  *Id.* at 694.  If the defendant fails to make the first showing, there is no reason to reach the second issue.  *Id.* at 697.

Under AEDPA, a state habeas petitioner must show that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner."

16

*Bell v. Cone*, 535 U.S. 685, 699 (2002). Thus, in reviewing Petitioner's attack on his state court convictions, the court presumes that factual determinations made by the state court are correct. Petitioner bears the burden of rebutting this presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Petitioner's primary argument is that defense counsel were ineffective for failing to investigate and present available evidence that the victim's death was not a homicide but instead was suicide or accident. In support of this argument, Petitioner asserts, among other things, that defense counsel had access to the victim's medical records which showed that she had suffered from depression for many years and that she had serious physical ailments as well, including hypertension and heart disease, which could have resulted in her death.

The record reveals that one of Petitioner's attorneys, Brian Aus, issued a subpoena for the medical records of Ms. Harris, and the records were released to him and to the prosecution. Mr. Aus reviewed the records, "looking for anything that would help" Petitioner. (MAR Hr'g 72-74). Counsel noted the victim's history of hypertension going back thirty years, as well as a diagnosis of depression and history of mental health treatment. He also noted that clinical treatment notes indicated that the victim was "on disability." (*Id.* at 97). Mr. Aus testified at the MAR hearing that after reviewing the records he did not turn them over to any medical expert for examination. He did give the records to Dr. Hilkey, a psychologist, who reviewed the records but, according to Mr. Aus, told Mr. Aus that they were not

17

useful. At that point, Mr. Aus "forgot" about the records, an admitted "oversight." (*Id.* at 279). The records were not used at trial, although Mr. Aus testified that they would have been helpful (*Id.* at 285). In addition, defense counsel did not object at trial to the state's minimization of Ms. Harris's medical condition and did not use the records to cross-examine state witnesses who testified that Ms. Harris was in fairly good health.

The MAR court addressed this issue in its order:

> 53. Scanlon next argues that because his trial attorneys had access, before trial, to the "truth" about Ms. Harris's medical condition, yet they never presented it to any medical expert for review, never corrected the prosecutors' alleged misrepresentations on this crucial issue, and never brought the "truth" to the attention of either "the Medical Examiner or Defendant's capital jury," their performance was objectively unreasonable under *Strickland* . . . .

> 54. For similar reasons as discussed above, this Court concludes that Scanlon has failed to show any deficient performance by his trial attorneys under the first prong of the *Strickland* [] test in the guilt/innocence phase of the trial. In addition, this Court has found from the evidence presented at the evidentiary hearing that Ms. Harris's medical records were reviewed by Mr. Aus, who even attached tabs and wrote notes thereon, highlighting Ms. Harris's documented depression, anxiety, hypertension, and disability, among other things. Therefore, Mr. Aus did more than just request and obtain the medical records; he reviewed them for content. Mr. Aus also gave the records to Dr. Hilkey on or about April 3, 1998, for the specific purpose of developing a possible suicidal theory of defense. Mr. Aus and Mr. Castle interviewed both Dr. Thompson and Dr. Rudner about the possibility of the suicide theory and the sexual asphyxiation theory. The evidence before this Court, though minimal in many regards, shows a reasonably sufficient investigation by Mr. Aus and Mr. Castle **for the GUILT PHASE of the trial.**

(MAR Order 57-58) (emphasis in original).

Under § 2254(e)(1), the factual findings and decision of the state court are presumed to be correct. Judicial scrutiny of counsel's performance must be highly deferential, and courts must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct. *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Counsel has a duty to make "reasonable" investigations into relevant lines of defense in a particular case. *Id.* at 691. A decision not to investigate further is "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Bacon v. Lee*, 225 F.3d 470, 481 (4th Cir. 2000) (quoting *Strickland*, 466 U.S. at 691).

Counsel testified at the MAR hearing that the theory of the defense case in the guilt/innocence phase was (1) Ms. Harris's death was not a homicide; or (2) Petitioner could not have committed it because he was not in Durham at the time of the victim's death. (MAR Hr'g 284). Under these circumstances, especially with regard to the first defense theory, it would have been reasonable for counsel to use the information in the medical records to show that it was possible that the victim either committed suicide or died of natural causes related to her heart disease. Counsel admitted that he noted the issues, and even marked the medical records, but he clearly failed to follow through and did not turn the records over to a medical

19

expert. There was testimony at the MAR hearing that the evidence would have aided the defense experts.[4] Thus, in the view of this court, counsel was deficient in not using the medical records, whether it be in preparing for trial, obtaining or preparing expert testimony, or in cross-examining state witnesses. Under the circumstances of this case, it cannot be said that trial counsel made a strategic choice not to use the medical records or not to turn them over to a medical expert. The conclusion of the state MAR court to the contrary was an unreasonable application of the governing precedents under *Strickland*.

Nevertheless, a finding of deficient performance does not end the case and warrant the issuance of a writ. As the Supreme Court has instructed, and countless cases have demonstrated, in order to prevail, a habeas petitioner must also show that deficient performance by counsel prejudiced the defendant and prevented him from obtaining a fair trial. Or, as recently noted by the Fourth Circuit, "even if a petitioner is able to show that his counsel's performance fell below an objectively reasonable standard, he has won only half the battle, for he must also show that, absent his counsel's errors, the outcome of the proceeding would have been different." *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008). The question becomes, therefore, in light of the medical records indicating that the

---

[4] These experts, who testified only at the MAR hearing, included Dr. James Tcheng, a cardiologist at Duke University; Dr. Louis Levy, a forensic pathologist; and Dr. Richard Hudson, a forensic pathologist who had served as the chief medical examiner for the state of North Carolina from 1968-86.

20

victim suffered from depression and heart disease, whether there is a reasonable

probability that the outcome of the trial would have been different if defense counsel

had used the medical records, either by providing them to medical experts in

preparation for testifying, or using the medical evidence to cross-examine or

discredit prosecution witnesses. The state MAR court found, alternatively, that even

if counsel's performance were found to be deficient, there was no reasonable

probability that any of the alleged errors of Petitioner's trial attorneys affected the

outcome of the trial at the guilt/innocence phase:

> As discussed above, the defense strategy clearly was to attempt to create reasonable doubt about the cause of Ms. Harris's death by suggesting that Ms. Harris died either: (1) naturally, as a result of a cocaine-induced heart attack while engaged in some unspecified sexual activity; or (2) accidentally, by sexual asphyxiation from the plastic bag wrapped around her head. Under these circumstances, the medical records showing Ms. Harris's history of anxiety and depression would not likely have bolstered the defense, at least to any significant degree. The severity of Ms. Harris's heart condition was substantially before the jury.
>
> . . . Therefore, on the face of the current record and the evidence presented at the evidentiary hearing, this Court **CONCLUDES** that, even if his trial attorneys' inactions were objectively unreasonable, [Petitioner] was **NOT** prejudiced concerning the medical records or other alleged failures, and [Petitioner] is **NOT** entitled to relief . . . **as to the jury verdict in the GUILT/INNOCENCE PHASE OF THE TRIAL**.

(MAR Order 58-59) (emphasis in original).

In the opinion of this court, the question of whether counsel's errors prejudiced

Petitioner is a close one. On habeas, however, it must be remembered that the task

of this court is to determine whether the state court decision was a result of an

unreasonable application of Supreme Court precedent.  Viewing the totality of the evidence before the jury, there is not a reasonable probability that, had trial counsel used the victims' medical records, and prepared a medical expert using the medical records, the jury would have returned a not guilty verdict.  There was substantial evidence pointing to Petitioner's guilt, including the fact that Petitioner spent the days after Ms. Harris's death traveling in her car and using her credit cards.[5]  There was evidence introduced that Ms. Harris was afraid of Petitioner, who had a key to her residence, so much so that she scheduled someone to change the locks on her home.  (Trial Tr. vol. I, 2045-47, 2221.)  Ms. Harris also arranged for her nephew and his girlfriend to move in with her at the end of January, three weeks before her death, because of her fears.  (Trial Tr. vol. I, 2045.)  There was evidence that Ms. Harris had filed incident reports with the Durham Police Department against Petitioner and his girlfriend, Kim Senter, for checks and credit card fraud. (Trial Tr. vol. I, 2049; Resp. Ex. 1, 265-70).  In addition, Edward Hicks, who delivered firewood and did odd jobs for the victim, testified that Ms. Harris had told him that Petitioner had threatened to kill her if she did not stop blaming him for stealing her money and credit cards.  (Trial Tr. vol. I, 2218.)  There was evidence that Petitioner pawned a

---

[5]  The court notes that after Petitioner was ultimately arrested in Syracuse, New York, he was interviewed by the FBI.  Petitioner told the FBI agent that he had been abducted from his motel room in Durham on the weekend before Ms. Harris's death, that he was tied up and held in an unknown house for two days, and that he was later dropped off by his abductors, given Ms. Harris's car and credit cards, and told to get out of the area.  (Trial Tr. vol. III, 3684-92.)

22

gold nugget ring in Durham at 4:12 p.m. on Monday February 26, 1996 (Trial Tr. vol. II, 2753-60), and that Carlos Breeden, the victim's nephew who lived with her, had a similar ring which was missing from his room in the victim's home, (Trial Tr. vol. I, 2327-29, 2370-71). In sum, this evidence and more supports the jury verdict and there is no reasonable probability that the verdict would have been different if counsel's performance had not been deficient with regard to use of the victim's medical records.

Petitioner also asserts that trial counsel were ineffective for failing to investigate evidence that Gary Yates, an acquaintance of the victim, had been charged with multiple drug offenses and that Ms. Harris had paid attorney's fees for Mr. Yates. The MAR court found that, at the direction of attorney Aus, the defense investigator unsuccessfully attempted to find and interview Mr. Yates; but that Mr. Yates later contacted the investigator's office and stated that he could not help Petitioner, that he never saw Ms. Harris do drugs, and that Petitioner had stolen $1500 from him. (MAR Order 35; MAR Hr'g 458-59.) The MAR court found that defense counsel's performance with regard to the testimony of Mr. Yates, was not deficient. The state court's adjudication of this claim of ineffective assistance of counsel was not contrary to clearly established federal law, nor did it involve an unreasonable application of the clear precedent of *Strickland* and its progeny. In addition, the state court's finding did not result in a decision that is based upon an

23

unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Petitioner also contends that trial counsel were ineffective for failing to exercise available peremptory strikes during jury selection to exclude certain jurors from the jury panel. Specifically, Petitioner argues that counsel did not use available peremptory strikes to exclude three jurors: former Durham Mayor Harry Rodenhizer who, according to Petitioner, admitted that his friendship with the trial judge and prosecutors could affect his view of the proceedings; Katherine Siler, whose cousin had been raped and stabbed by a man who killed himself after killing his parents; and Bernadette Longhorn, whose sister was sexually assaulted and drowned.[6] Petitioner raised this issue in his direct appeal before the North Carolina Court of Appeals, which noted the issue, but did not specifically analyze the substance of the claim while finding no error in the lower court's findings of fact and conclusions of law. *Scanlon*, 176 N.C. App. at 439-42, 626 S.E.2d at 789-91.

A review of the trial record shows that all three of the jurors now challenged by Petitioner indicated during *voir dire* that they could be fair and impartial jurors in spite of their personal experiences, or, in the case of Mr. Rodenhizer, in spite of his personal acquaintance with Durham District Attorney Jim Hardin, who was not directly involved in the prosecution of this case. (Resp. Ex. 10, 300; 415; 911.)

_____

[6] Petitioner raised this issue in the Attachment to the habeas petition, but he did not specifically address it in his supporting brief.

Because Petitioner has not pointed to any legal basis for this claim, it is difficult to ascertain his argument. Nevertheless, the court finds that the record, including the trial transcript, demonstrates that the trial court and the attorneys asked significant *voir dire* questions, and the three jurors, along with other members of the venire, demonstrated that they would be fair and impartial. Moreover, Petitioner has put forward no evidence that any of these jurors were in fact unqualified or failed to follow the instructions given to them by the trial court. Thus, Petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687.

### D. Claim II: Prosecutorial Misconduct

Petitioner alleges that prosecutorial misconduct requires that he receive a new trial. Specifically, Petitioner alleges that the state: (a) suppressed evidence of Ms. Harris's drug abuse; (b) suppressed evidence of Ms. Harris's complete disability from severe depression and heart disease; (c) suppressed material impeachment evidence; (d) misrepresented Ms. Harris's health; and (e) made an improper argument to the jury. Petitioner claims that the prosecutor's knowing exclusion of evidence and misrepresentations created a false impression before the jury and violated Petitioner's due process rights. Petitioner's claims fall into three categories: knowing use of false evidence (*Napue* claim), failure to turn over exculpatory evidence to the defense (*Brady* claim), and misrepresention of the evidence.

25

In order to establish prosecutorial misconduct, a petitioner must show that the prosecutor's conduct was so egregious as to render his trial fundamentally unfair. *See Greer v. Miller*, 483 U.S. 756, 765 (1987) ("To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial."). In analyzing a due process claim premised on unfair prosecutorial conduct, a court must look at numerous factors including: the nature of the alleged prosecutorial conduct; the extent of the improper conduct; the issuance of curative instructions from the court, if any; any defense conduct inviting the improper prosecutorial action; and the weight of the evidence. *Humphries v. Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005).

Moreover, in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In *Napue v. Illinois*, the Supreme Court noted that a "State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." 360 U.S. 264, 269 (1959).

26

### 1. Suppression of Exculpatory Evidence

Petitioner asserts that the prosecution withheld notes written by the victim's sister and by prosecutors pertaining to evidence of the victim's health and alleged drug use, evidence of the victim's disability, and pretrial notes regarding certain evidentiary issues. First, with regard to the alleged withholding of evidence regarding Ms. Harris's health, the MAR court found that the defense had access to the victim's medical records, and that "[t]here is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object or cross-examine the witness regarding the alleged false testimony." (MAR Order 48.) Put another way, the MAR court found that any failure to raise this issue or use the medical records was not the fault of the prosecution. (Id. at 47-48.) *See Barnes v. Thompson*, 58 F.3d 971, 975 n.4 (4th Cir. 1995) ("*Brady* requires that the government disclose only evidence that is not available to the defense from other sources, either directly or through diligent investigation."). Moreover, the victim's sister did testify that she was concerned about the victim's health and there was evidence before the jury that Ms. Harris had a heart problem.[7]

---

[7] With regard to Petitioner's claim that the notes and other information were exculpatory and thus improperly withheld, the undersigned has reviewed the information allegedly withheld and fails to see how that evidence is exculpatory. The evidence (Resp. Ex. 1, 669-718) consisted of six handwritten pages of notes, fashioned in a timeline, from Ms. Breeden, other prosecution and interview notes, and social security disability documents. While there may have been some inconsistencies that could have been used for impeachment purposes, none of the evidence Petitioner points to actually establishes his innocence. Petitioner, moreover, has not shown that the outcome of the trial would have been different had he had access to this material.

Defense counsel had the opportunity to cross-examine the witnesses regarding this issue. Likewise, defense counsel had access, through Petitioner, to the same information that the state had regarding the victim's alleged drug use and her hospitalization for heart problems in December 1995. The prosecutor's notes, which basically consisted of words jotted down during interviews and investigations, were not discoverable by Petitioner unless they were exculpatory or contained evidence which could be used for impeachment purposes and could not be obtained by other means. *Brady*, 373 U.S. at 87. Petitioner, quite simply, has not shown that the prosecution improperly withheld any evidence. Moreover, Petitioner has failed to show that the failure to turn over the evidence prejudiced Petitioner or that if Petitioner had received the evidence the outcome of the proceedings would have been different.

This court finds that the state court decision was not contrary to, nor involved an unreasonable application of, clearly established Supreme Court precedent. Likewise, the court does not find that the state court ruling was based on an unreasonable determination of facts in light of the evidence presented in state court proceedings. Thus, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

### 2. Misrepresentation of Evidence

In a separate but related argument, Petitioner also alleges that the state intentionally misrepresented that the victim was in good health when in fact the

28

prosecution knew that she was totally disabled and was in failing health. The MAR court found "in context of the trial as a whole, the alleged misrepresentations were not so misleading as to rise to the level of a state or federal due process violation." (MAR Order 49-50.) Again, this court notes that defense counsel had access to the victim's medical records and thus could have presented evidence, or cross-examined prosecution witnesses, with regard to this issue. Moreover, a review of the record does not reveal any material misrepresentations by the state. As noted, the MAR court found:

> 48. . . . there is no violation of due process resulting from prosecutorial nondisclosure of or failure to correct allegedly false testimony if defense counsel is aware of it and fails to object to or cross-examine the witness concerning the alleged false or misleading testimony. [Petitioner] and his trial attorneys were in a position to object to, cross-examine, or argue to the jury any alleged false testimony by the witnesses or misleading arguments by the prosecutors. By failing to take corrective measures at the time of the trial, the trial attorneys implicitly acknowledged the lack of merit to the present claims of false or misleading testimony. Therefore . . . this Court concludes that [Petitioner] waived the right to assert any error in this regard.

(*Id.* at 53-54 (internal citations omitted).)

This court does not find that the state court decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. Likewise, the court does not find that the state court ruling was based on an unreasonable determination of facts in light of the evidence presented in state court proceedings.

Petitioner also contends that the state knowingly withheld information regarding the victim's disability status, arguing that Barbara Breeden provided the prosecutors with a social security order which found Ms. Harris to be "completely disabled from January 1990 onward from severe depression and heart disease . . . ." (MAR Attach. 62) and that the order was never disclosed to the defense. Petitioner also argues that Ms. Breeden falsely testified that Ms. Harris was on "short term disability." The MAR court found that "the mere fact Mrs. Breeden indicated that her sister was on 'short term disability' and did not volunteer that Ms. Harris's estate was receiving Social Security disability benefits was not material, was not so misleading as to rise to the level of a state or federal due process violation, and could not have affected the jury's judgment." (MAR Order 52.) On appeal, the state court of appeals stated: "we cannot conclude that Ms. Breeden's testimony about Ms. Harris's social security benefits was a material misrepresentation that 'could have affected the judgment of the jury.'" *Scanlon*, 176 N.C. App. at 439, 626 S.E.2d at 789 (citation omitted).

Petitioner also argues that the prosecution misrepresented that he possessed a key to Ms. Harris's house when in fact the only keys in evidence, the keys found in Ms. Harris's car in New Orleans, did not fit the locks on Ms. Harris's house. This argument is without merit. Based on the evidence presented at trial, the jury could have found that Petitioner had access to a key to Ms. Harris's home because he had

Case 1:07-cv-00498-TDS-WWD   Document 22-2   Filed 04/10/08   Page 30 of 45

used a key in the past, and there was no misrepresentation of the evidence by the prosecution.

In light of the standards cited above, the court finds that the state court's determination that the prosecution did not knowingly put forth false, or even misleading, testimony is not contrary to or an unreasonable application of Supreme Court law nor an unreasonable determination of facts. The actions of the prosecution were not improper nor did they render the trial fundamentally unfair. Accordingly, this claim is without merit.

### 3. Improper Argument

Petitioner argues that the "[p]rosecutors' repeated, inflammatory misrepresentations of evidence and interjections of personal opinion violated due process and require a new trial." (Pet. Br. 26.) Petitioner asserts that the prosecutor improperly introduced the "unfounded, extremely inflammatory accusation of attempted necrophilia" in the closing argument and improperly vouched for witnesses and falsely accused the defense of tampering with the evidence. *Id.*

In the closing argument, the prosecutor argued that the fact that Petitioner's hair, including a pubic hair, was found in the victim's bedding showed some sort of sexual assault at the time of death. As noted by the state court of appeals, evidence of a negative rape kit had already been presented to the jury. Given the totality of the circumstances, the prosecutor's argument and actions did not render the proceedings fundamentally unfair. *See Bennett*, 92 F.3d at 1345. For the foregoing

31

reasons, the North Carolina Court of Appeals' rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  *See* § 2254(d)(1).

## E.  Claim III:  Confrontation Clause

Petitioner alleges that the trial court erred in admitting testimony concerning a statement by his girlfriend, Kim Senter, in violation of his rights under the Confrontation Clause of the Sixth Amendment.  At the outset, the court notes that Petitioner has not presented specific facts to support this claim.  In fact, Petitioner's sole statement of facts supporting this claim reads:

> With no evidence of forced entry or struggle in Harris's house, the state's case rested on the notion that Petitioner entered illegally with a key.  The prosecutors' misconduct regarding the keys and locks is discussed in Part H.2 of Claim I, *supra* and incorporated herein by reference.  The prosecutors also presented witnesses, who said that Harris said that Kim Senter said that Petitioner had a key.  The state chose not to present Senter to the jury because she was an unreliable "hoodlum."  The state Court of Appeals correctly found constitutional error in this conduct.  The Court mistakenly found the error harmless. The Court found "overwhelming" the same evidence of guilt that the trial judge ruled insufficient to support felony murder instructions and so speculative that it "surely . . . supported different theories" about Harris's demise.  That legal error is reversible *de novo*.

(Pet., Attach. at 66-67).  Petitioner, at the end of this statement, cites to several transcript pages.  Petitioner does not specifically indicate, in the body of his argument, which statements and witnesses he is referencing.  The court is left to make the assumption, as Respondent did, that the statement at issue was one by by the victim's sister, Barbara Breeden, who testified that Ms. Harris had told her that

32

Kim Senter had said that Petitioner had a key to Ms. Harris's home. Petitioner claims that this hearsay testimony was "crucial to the state's case" (Pet. Br. 27), and that the admission of the evidence violated his Sixth Amendment right to be "confronted with the witnesses against him." U.S. CONST. amend. VI; *see Crawford v. Washington*, 541 U.S. 36, 59 (2004) ("Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]."). Here however, there is no evidence to suggest that Kim Senter knew that her statements to Ms. Breeden would later be used at trial. The out-of-court statement objected to, therefore, clearly was not testimonial,[8] and the Supreme Court in *Crawford* noted that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." 541 U.S. at 68. Thus, to be admissible, non-testimonial statements must meet state hearsay exception requirements, which, in North Carolina require "particularized guarantees of trustworthiness." N.C. GEN. STAT. § 8C-1, Rule 804(b) (2007). In determining whether a statement has "particularized guarantees of trustworthiness," North Carolina courts must consider, among other factors, "(1) assurances of the declarant's personal knowledge of the

---

[8]  *See United States v. Jordan*, 509 F.3d 191, 201 (4th Cir. 2007) ("To our knowledge, no court has extended *Crawford* to statements made by a declarant to friends or associates."); *Whorton v. Bockting*, 127 S.Ct. 1173, 1183 (2007) ("Under *Crawford . . .* the Confrontation Clause has no application to [out-of-court non-testimonial] statements and therefore permits their admission even if they lack indicia of reliability.").

underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination." *State v. Triplett*, 316 N.C. 1, 10-11, 340 S.E.2d 736, 742 (1986) (citing *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985)). The Fourth Circuit has held that "[t]he standard that the North Carolina courts have formulated for evaluating whether hearsay evidence has particularized guarantees of trustworthiness sufficient to admit it under [the residual hearsay exception] satisfies the Constitution's demands." *Hayes v. York*, 311 F.3d 321, 327 (4th Cir. 2002).

The North Carolina Court of Appeals held that the testimony of Ms. Breeden concerning Kim Senter's statement was erroneously admitted under North Carolina's residual hearsay exception, N.C. GEN. STAT. § 8C-1, Rule 804(b)(5).[9] The court

---

[9] Rule 804(b)(5) of the North Carolina Rules of Evidence is identical to Rule 803(24) which is the residual hearsay exception governing situations where the availability of the declarant is immaterial. They both read as follows:

Other Exceptions.–A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

went on, however, to find that the error was harmless and did not require reversal of Petitioner's convictions: "After reviewing the record in this case, we conclude that the trial court's error in admitting Ms. Breeden's testimony regarding the duplicate key does not necessitate reversal of Defendant's conviction." *Scanlon*, 176 N.C. App. at 429, 626 S.E.2d at 783.

The court need not decide whether the admission of the statements by Ms. Breeden about the duplicate key violated the Confrontation Clause. Even if it did, any error is harmless. In conducting harmless error review in federal habeas cases, a court may grant relief only if, after consideration of the entire record, it can conclude "with fair assurance" that a trial error had a substantial and injurious effect or influence on the jury's verdict, *Kotteakos v. United States*, 328 U.S. 750, 765 (1946), or is in "grave doubt" as to this question, *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). *Kotteakos* involved a direct appeal of a federal conviction, but the Supreme Court later adopted the same standard for collateral review of a state court criminal judgment under 28 U.S.C. § 2254. *Brecht v. Abrahamson,* 507 U.S. 619, 637-38 (1993). *See also Fry v. Pliler*, 127 S. Ct. 2321, 2326-28 (2007) (holding that

*Brecht-O'Neal* standard applies in all § 2254 cases, even post-AEDPA ones).[10]
Evidentiary rulings are likewise subject to harmless error review. *See United States v. Banks*, 482 F.3d 733, 741-42 (4th Cir. 2007) (in a harmless error review, "we need only be able to say with fair assurance, after pondering all that has happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.") (citing *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997)).

The evidence against Petitioner in this case was substantial, including evidence that Petitioner spent the days after Ms. Harris's death traveling in her car and using her credit cards; evidence that Petitioner abandoned Ms. Harris's car in New Orleans and that when he was arrested in Syracuse, New York, he was in possession of several of her credit cards and a piece of paper containing Ms. Harris's name, social security number and date of birth; evidence that Petitioner pawned a gold ring, similar to one belonging to the victim's nephew, in Durham on the afternoon of February 26, 1996; evidence that DNA consistent with Petitioner's DNA was found on a cigarette butt in Ms. Harris house, and her nephew testified that

---

[10] The North Carolina Court of Appeals, in holding that the trial court's error in allowing Ms. Breeden to testify as to Kim Senter's statement was harmless beyond a reasonable doubt", applied the standard from *Chapman v. California*, 386 U.S. 18, 24 (1967). Notwithstanding the state court's application of the *Chapman* standard, on collateral review harmlessness is assessed under the "substantial and injurious effect" standard set forth in *Brecht*, 507 U.S. at 637. *See Fry*, 127 S. Ct. at 2328 (holding that the *Brecht* standard applies on collateral review, regardless of whether the state appellate court reviewed the error for harmlessness under the *Chapman* standard).

the cigarette butt was not present on Sunday February 25, 1996, the day before the State contends Ms. Harris was murdered; and evidence that Ms. Harris had filed complaints with the police about Petitioner's unauthorized use of her credit cards and forgery of her checks. These and other lines of evidence combine to make it highly unlikely that any verdict other than guilty would have been obtained had the challenged out-of-court statements not been heard by the jury. The isolated statements Petitioner complains of cannot have had a substantial and injurious effect on the jury's verdict. Any constitutional error in their admission is therefore harmless, and Petitioner's Claim III should be denied.

### F. Claims IV and V: Failure to Instruct on Accident Defense; Failure to Instruct on Involuntary Manslaughter as Lesser-Included Offense of First-Degree Murder

In his fourth claim, Petitioner alleges that the trial court erred in failing to give a jury instruction on accident as a defense to first-degree murder. Petitioner did not request such an instruction at trial, but the state court of appeals found that based on the evidence presented at trial, specifically the testimony of Dr. Lawrence Harris that Ms. Harris died of a heart attack in connection with cocaine use and oxygen deprivation possibly as a result of sexual asphyxia, the trial court should have instructed the jury on the accident defense. *Scanlon*, 176 N.C. App. at 424, 626 S.E.2d at 780. Nevertheless, the court went on to find that the omission by the trial court of such an instruction did not rise to the level of plain error. *Id.*

37

Under the doctrine of procedural default, the federal court is precluded from reviewing the merits of any claim that was found to be procedurally barred by the state court on adequate and independent state grounds. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). A state rule is "adequate" if it is firmly established and regularly applied by the state court. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *McCarver v. Lee*, 221 F.3d 583, 588 (4th Cir. 2000).

Here, there is no doubt that Petitioner's failure to object to the jury instructions at trial constitutes a sufficient procedural bar to prohibit review by this court on habeas. Because Petitioner failed to raise the issue concerning the jury instruction at trial, upon appellate review, the state court of appeals adjudicated and denied the claim under the plain error standard of review. Therefore, under the North Carolina Rules of Appellate Procedure, Petitioner waived the normal standard of review. N.C. R. APP. P. 10(b)(2) (2001). The appellate court's review of the allegedly erroneous jury instruction under the plain error doctrine does not waive procedural default in the state court. *See Daniels v. Lee*, 316 F.3d 477, 487-88 (4th Cir. 2003) (state court's plain error review constitutes enforcement of procedural bar for failure to object at trial and precludes federal habeas review, absent cause and prejudice); *Reid v. Warden*, 708 F. Supp. 730 (W.D.N.C. 1989) (plain error review by North Carolina appellate court does not waive procedural default for failure to make contemporaneous objection to jury instruction at trial). As such, Petitioner's claim

38

that the jury instruction violated his constitutional rights is procedurally barred and

Petitioner has failed to raise grounds to overcome the default.[11]

In his fifth claim, Petitioner alleges that the trial court erred in denying his

request for a jury instruction on involuntary manslaughter. Petitioner's argument with

regard to this issue is conclusory, at best:

> The same evidence supported Petitioner's requested instruction on
> involuntary manslaughter. His rights to due process, the presumption
> of innocence, and the freedom from involuntary self-incrimination were
> destroyed when the judge refused to instruct on involuntary
> manslaughter unless Petitioner personally said something to support it.
> . . . Omission of . . . the involuntary manslaughter instruction[] was
> severely prejudicial. The trial judge said that everyone "had to
> speculate" over the weak circumstantial evidence on cause and manner
> of death, and found the evidence insufficient for felony murder. The
> jury likely would have acquitted or chosen the lesser offense had they
> known the governing law. The murder conviction must be vacated.
> *Beck v. Alabama*, 447 U.S. 625, 65 L. Ed. 2d 392 (1980).

(Pet. Br. 28). These conclusory contentions, without meaningful specification,

cannot form the basis for habeas relief. *See generally Nickerson v. Lee*, 971 F.2d

1125, 1136 (4th Cir. 1992) (". . . a habeas petitioner must come forth with some

evidence that the claim might have merit. Unsupported, conclusory allegations do

not entitle a habeas petitioner to an evidentiary hearing.").

---

[11] Petitioner also asserts, briefly, that trial counsel were ineffective for failing to request a jury instruction on accident as a complete defense to homicide. (Pet., Attach. at 53.) Even ignoring the conclusory nature of Petitioner's claim, he again has failed to meet the *Strickland* standard for ineffective assistance of counsel with regard to this claim. Even if counsel were deficient in not requesting such an instruction, Petitioner has not shown that the deficient performance resulted in actual prejudice, i.e, he has not shown that but for the deficiency there was a reasonable probability that the result at trial would have been different. Accordingly, this claim is without merit.

Moreover, this claim must be denied on the merits. Under North Carolina law, involuntary manslaughter is "the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *State v. Powell*, 336 N.C. 762, 767, 446 S.E.2d 26, 29 (1994). Petitioner requested an involuntary manslaughter charge on the basis of the "culpable negligence" element outlined above. (Trial Tr. vol. III, 3923-24.)[12] The trial court ruled that, based on the evidence, the case would go to the jury only on first-degree murder (*Id.* at 3924). On appeal, the North Carolina Court of Appeals ruled that because Petitioner's "sole and unequivocal defense was that he was not present at the time of death . . . , the trial court did not err in failing to submit an involuntary manslaughter instruction to the jury." *Scanlon*, 176 N.C. App at 423-24, 626 S.E.2d at 780. In so ruling, the North Carolina Court of Appeals relied upon prior North Carolina case law on involuntary manslaughter.

---

[12] Specifically, at the charge conference, defense counsel stated:

Based on what the State's evidence, the only thing we were looking at here is that the jury may conclude from what evidence that has been heard that Mr. Scanlon was, indeed, there but there was no premeditation and deliberation or malice aforethought. And given that, what you may be left with is acting in a criminally negligent way basically by jury's conclusions they may arrive at the conclusion that is indeed a manslaughter and that's about all I wish to be heard on that aspect, Your Honor.

(Trial Tr. vol. III, 3924).

40

In a capital case, when the evidence so warrants, a trial court must give a lesser included offense instruction. *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980). When, however,

> the highest court of a state has reviewed a defendant's request for a lesser included offense instruction and concluded that it is not warranted by the evidence elicited at trial, that conclusion is axiomatically correct, as a matter of state law. Accordingly, the circumstances that would induce a federal court to overturn the state court determination would need to be extraordinary, indeed.

*Bates v. Lee*, 308 F.3d 411, 418 (4th Cir. 2002). Such extraordinary circumstances are not present here. Because "federal habeas corpus relief does not lie for errors of state law," the only question here is whether the North Carolina court's finding that there was insufficient evidence to support an involuntary manslaughter instruction was so wrong as to amount to a fundamental miscarriage of justice. *Id.* A review of the record clearly belies that argument. There was simply no evidence or argument put forth by Petitioner at trial acknowledging that he was, or could have been, present in the victim's home at the time of her death; thus the evidence did not support an involuntary manslaughter instruction. The North Carolina trial court

41

reasonably ruled as much, and the North Carolina Court of Appeals did not unreasonably apply the relevant Supreme Court precedent to the facts of this case.[13]

## G: Claim VI: Insufficiency of the Evidence

Petitioner alleges that his constitutional rights were violated because insufficient evidence existed to support his conviction for first-degree murder. Petitioner raised this claim on direct appeal where it was denied on the merits. The North Carolina Court of Appeals ruled that the state presented sufficient evidence to allow a jury to find beyond a reasonable doubt that (a) Petitioner was present at the time of Ms. Harris's death, (b) the death was a result of homicide, and (c) Petitioner committed the murder with a specific intent to kill formed after premeditation and deliberation. *Scanlon*, 176 N.C. App. at 419-20, 626 S.E.2d at 777-78. In so ruling, the state court of appeals pointed to specific evidence presented by the state as to all three issues.

---

[13] The court notes Petitioner's argument, conclusory though it be, that the trial court, in its ruling on this issue, violated Petitioner's right to be free from "involuntary self-incrimination." (Pet. Br. 28.) In support of this argument, Petitioner cites *Mitchell v. United States*, 526 U.S. 314 (1999). This argument is without merit. In *Mitchell*, the Supreme Court held that a defendant who waives his Fifth Amendment right to remain silent by pleading guilty does not thereby waive his right to remain silent at his sentencing and that a sentencing court may not draw any adverse inferences from a defendant's silence at sentencing in determining facts relating to the circumstances of the crime. *Id.* at 326. The case has no application here. Moreover, the trial court did not state (or even imply) that Petitioner was compelled to testify. Instead, in the discussion regarding the charge (which was outside the presence of the jury), the trial court merely noted that Petitioner had not testified or admitted to anyone else facts which supported the accidental death by sexual asphyxia theory. (Trial Tr. vol. III, 3924.)

The underlying standard in a sufficiency of the evidence claim is oft-repeated: "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). A federal court's review of such claims is "sharply limited." *Wilson v. Greene*, 155 F.3d 396, 405 (4th Cir. 1998) (citing *Wright v. West*, 505 U.S. 277, 296 (1992) (plurality opinion)). The fact-finder, rather than the reviewing court, is charged with "resolv[ing] conflicts in the testimony, [weighing] the evidence, and [drawing] reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Circumstantial evidence can be sufficient to support a conviction. *Stamper v. Muncie*, 944 F.2d 170, 174 (4th Cir. 1991). A petitioner is entitled to relief only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Wilson*, 155 F.3d at 406.

This was clearly a case of circumstantial evidence, with multiple strands of evidence tying Petitioner to the crime. *See Jensen v. Maloff*, 484 F. Supp. 2d 404, 425 (D. Md. 2007) (circumstantial evidence sufficient to sustain petitioner's convictions). Just because one or more other non-incriminating inferences might be drawn from the evidence does not, in and of itself, make the jury verdict unreasonable under the *Jackson* standard. Here, as noted by the North Carolina Court of Appeals, sufficient evidence existed to support a finding beyond a reasonable doubt that Petitioner was guilty of first-degree murder. The written

43

decision of the appellate court denying this claim described both the elements of first-degree murder and the evidence supporting each element.  After reviewing all the evidence in the light most favorable to the prosecution, this court does not find that the state court decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  Likewise, the court does not find that the state court ruling was based on an unreasonable determination of facts in light of the evidence presented in state court proceedings.

### H.  Claim VII: Inadequate Murder Indictment

In his seventh claim, Petitioner alleges that the indictment in this case was defective because it omitted essential elements of first-degree murder and only alleged the elements of second-degree murder.  Petitioner does not address this issue in his supporting brief, however, and thus this argument is deemed abandoned.[14]

---

[14]  Moreover, on the merits the court notes that N.C. GEN. STAT. § 15-144 sets out the language necessary to charge the crime of "murder" in an indictment.  North Carolina statutory law recognizes two categories of "common law murder", *i.e.*, first-degree and second-degree murder, and the sentencing scheme differs with each one. *Hartman v. Lee*, 283 F.3d 190, 199 (4th Cir. 2002); N.C. GEN. STAT. § 14-17. The "short-form" indictment used in North Carolina has been found to be constitutional.  *See Stroud v. Polk*, 466 F.3d 291, 296-97 (4th Cir. 2006) (holding that North Carolina's short-form indictment passes constitutional muster as long as it notifies defendant in a murder case that he needs to defend against a charge of first-degree murder); *Allen v. Lee*, 366 F.3d 319, 324 (4th Cir. 2004) (holding that a short form indictment alleging elements of common law murder is sufficient to inform defendant of the charge against him).  The indictment in this case, which reads:  ". . . the defendant named above unlawfully, willfully and feloniously and of malice aforethought did kill and murder Claudine Wilson Harris," passes constitutional muster. (Resp. Ex. 1, 5.)

**I. Claim VIII: Cumulative Error**

In his final claim, Petitioner claims that the cumulative effect of the errors in this case denied him the right to a fair trial. This claim does not warrant relief. Habeas relief may not be granted on the basis of alleged cumulative error, alone. Rather, relief may be granted on the basis of each individual claim of error. *See Fisher v. Angelone*, 163 F.3d 835, 852-53 (4th Cir. 1998) (holding that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively."). The court has reviewed each of Petitioner's claims of error and has found that relief is not warranted on any of his claims.

## CONCLUSION

For the reasons stated herein, it is **RECOMMENDED** that Respondent's motion for summary judgment (docket no. 10) be **GRANTED**, that Petitioner's motion for summary judgment (docket no. 17) be **DENIED**, and that the Petition be dismissed with prejudice.

_____
Wallace W. Dixon
United States Magistrate Judge

April 10, 2008