IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DONALD JOHN SCANLON          )
                             )
            Petitioner,      )
                             )
     v.                      )          1:07CV00498
                             )
SID HARKLEROAD, Admin.,      )
Marion Correctional Inst.,   )
                             )
            Respondent.      )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

On April 10, 2008, in accordance with 28 U.S.C. § 636(b), the United States Magistrate Judge filed a Memorandum Opinion and Recommendation ("Recommendation"). (Doc. 22.) Petitioner Donald John Scanlon ("Scanlon") timely raised several objections to the Recommendation. (Doc. 26.) The court held oral argument on November 18, 2009, and requested supplemental briefing. After careful consideration and extensive review of the record, the objections are denied and the petition will be denied. Given the closeness of the question, the court writes separately to discuss in more detail the record evidence and will issue a certificate of appealability.

## I. BACKGROUND

The facts are set forth in more detail in the Magistrate Judge's Recommendation. Those facts necessary to resolve Scanlon's objections are set forth below.

On February 27, 1996, around 9:00 p.m., Carlos Breeden found his aunt, Claudine Wilson Harris ("Harris"), dead in her bed in her home in Durham, North Carolina. Harris' body was covered by stacks of her bed sheets, and a plastic dry cleaning bag was wrapped around her head. Her sweatshirt was pushed up and her sweatpants and underpants were partially pulled down. A soup can with holes punched in it, described as a pipe for smoking crack cocaine, was found near her bed. A toxicology report later revealed that Harris had cocaine metabolites in her blood.

Scanlon was arrested on March 10, 1996, in Syracuse, New York, on charges unrelated to Harris' death. Several of Harris' credit cards and a blank check from her business checking account were found in his possession. Scanlon admitted he had abandoned Harris' car a few days before in New Orleans, Louisiana.

Scanlon was charged with first-degree murder, felonious breaking or entering, felonious larceny of credit cards and a motor vehicle, and felonious possession of stolen goods. The State of North Carolina ("State") gave notice it would seek the

death penalty.  On June 14, 1996, Brian Aus ("Aus") and Lee R. Castle ("Castle") (collectively "Trial Counsel") were appointed to represent Scanlon.

Scanlon was tried at the May 7, 1998, Criminal Session of Durham County (North Carolina) Superior Court.  The trial lasted approximately four weeks.  The State called fifty witnesses, while the defense called five.  The majority of the State's witnesses testified about the theft-related charges.  The State's evidence linking Scanlon to Harris' death was largely circumstantial.

The evidence revealed Scanlon's and Harris' tumultuous relationship.  Scanlon had previously worked for Harris as a handyman from October 1995 through January 1996.  He also lived in her house from November 1995 through January 1996 until Harris evicted him and sought to take out a warrant against him after discovering he had misused her credit cards and forged checks on her bank account.  Scanlon threatened to kill Harris for accusing him of stealing her credit cards and checks.  At one point, Harris shot at Scanlon and threatened to kill him. Harris feared Scanlon had a key to her house and, soon after evicting Scanlon, asked her nephew, Carlos Breeden, along with his girlfriend to move in with her to help keep her safe.  They both moved into Harris' house at the end of January 1996.

The State's forensic pathologist, Dr. Robert Thompson ("Dr. Thompson"), testified at trial that Harris' death was homicide caused by asphyxiation. He based his conclusion on the information he received from the police, primarily that Harris was found with a plastic bag wrapped around her head which was tied in a knot, sheets and blankets were piled on top of her body on her bed, items in her house had been disturbed, and her car had been stolen.

There was evidence that Scanlon had been in Harris' house around the time of her death. A cigarette butt in Harris' house, not present two days before her death, contained saliva that matched Scanlon's saliva. Scanlon's head hairs and one pubic hair were found on Harris' bed. Further, on the day of Harris' death Scanlon pawned a gold ring similar to one that Carlos Breeden owned and which went missing following Harris' death.

Trial Counsel's defense was two-fold: first, Harris' death was not a homicide; and second, Scanlon was not in Durham at the time of her death. Scanlon's forensic pathologist, Dr. Lawrence Harris ("Dr. Harris"), testified that Harris died of a cocaine-induced coronary blockage during attempted sexual asphyxiation.[1]

---

[1]    Sexual asphyxiation, or more commonly autoerotic asphyxiation, is the intentional restriction of oxygen to the brain for sexual arousal during masturbation. Gilles Tournel et al., Complete Autoerotic Asphyxiation: Suicide or Accident?, 22 Am. J. Forensic Med. & Pathology 180, 180 (2001).

He based his opinion on the presence of the plastic bag, the cocaine metabolites in Harris' blood, and new clots blocking the bypass artery in Harris' heart. Dr. Harris admitted on cross-examination that he had never reviewed Harris' medical records. He also admitted that the presence of a knot in the plastic bag wrapped around Harris' head led him to agree that someone else was likely in the room with her.

The jury found Scanlon guilty of first-degree murder, felonious breaking or entering, and two counts each of felonious larceny and felonious possession of stolen goods. On June 9, 1998, following a capital phase, Scanlon was sentenced to death for the first-degree murder and to two consecutive terms of ten to twelve months' imprisonment for the remaining counts.

On May 5, 2000, Scanlon, through his counsel, filed a Motion for Appropriate Relief ("MAR") in the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. §§ 15A-1415(b)(3) and 15A-1418(a). He amended the MAR twice. After oral argument, the North Carolina Supreme Court remanded Scanlon's MAR to the Durham County Superior Court for an evidentiary hearing. State v. Scanlon, 352 N.C. 155, 155, 544 S.E.2d 241, 241 (2000); see State v. Scanlon, No. 96-CRS-7069-71 (N.C. Super. Ct., Durham County), Evidentiary Hearing on Motion for Appropriate Relief (October/November 2002) ("MAR Hearing").

Among the issues Scanlon raised at the MAR Hearing were the following: first, that prosecutors made numerous misrepresentations at trial that minimized the severity of Harris' medical condition; and second, that Trial Counsel were ineffective in violation of Strickland v. Washington, 466 U.S. 668 (1984). The second claim was based on Trial Counsel's failure to do the following: present Harris' medical records to an expert for review; use the records to correct the State's mischaracterization that Harris' cardiac disease had been corrected by surgery and was controlled by medicine, that she was functioning "fine", and that her health was in any respect "good"; and utilize the records to bring "the truth to the attention of either the Medical Examiner or Defendant's capital jury." (State v. Scanlon, N.C. Ct. App. Docket No. 05-119, R. on Appeal at 490, 534-35 (Scanlon Mot. for Appropriate Relief).)

At trial, evidence was adduced that Harris had gone to the hospital in December 1995 due to her feeling ill, had severe coronary artery disease, had likely suffered a heart attack in the past, and had undergone coronary bypass surgery. Prosecutors represented that she was able to function normally after her surgery, as the surgery corrected her coronary problems.

Prior to the trial, Aus issued a subpoena for Harris' medical records, and the records were released to him and to the

prosecution. The records reveal the following: in addition to suffering from advanced coronary artery disease, Harris was suffering from permanent heart damage and long-standing mental-health issues. After an inferior myocardial infarction (heart attack) in September 1987, she underwent bypass surgery to place vein grafts to the right coronary artery and left anterior descending artery. Her heart disease was compounded by multiple risk factors, including significant family history for hypertension and heart disease, thirty years of smoking, hypercholesterolemia, hypertriglyceridemia, hypertension, and a long-term history of depression and anxiety. She had an echocardiogram in 1994 that suggested a diagnosis of diastolic dysfunction, right-sided heart failure in Harris' case. She was placed on 100% disability since 1990 due to her coronary artery disease. Harris had multiple instances of emergency treatment for acute congestive heart failure and Class III congestive heart failure, including several in the summer of 1994, which suggested substantial morbidity resulting from her coronary disease. Importantly, Harris was taken to the emergency room on December 28, 1995, due to syncope (fainting) and chest pain at rest, indicating the development of unstable angina and triggering a subsequent three-to-six-month period of high risk of myocardial infarction and sudden death. She was directed by doctors upon her discharge to visit a cardiologist the first

week of January 1996 as a result of her December 1995 trip to the emergency room, but she never went.

Her medical records also reveal over a twenty-year history of complaints and treatment for depression and anxiety, including seeing a psychiatrist and taking a variety of antidepressants and anti-anxiety medications, including Elavil, Xanax, Zoloft, Temazepam, Sinequan, Tranxene, and Paxil. The records include notes such as the following: "can't keep body & mind together" (12/3/76); depression (12/30/77); "appears depressed" (9/13/78); mild depression (7/29/85); "appears depressed" (9/7/90); "feeling worthless, energyless, crying spells, feeling blue & low in spirits" (1/8 & 19/93); and a note that Harris had been referred to Dr. Gianturo [sic], a psychiatrist. (MAR Hearing, Def.'s Exs. 2 & 34.)

Before trial, Trial Counsel reviewed the records, tabbed them for important information, and sent them to Dr. James Hilkey ("Dr. Hilkey"), a psychologist, for a possible psychological profile of Harris. At the MAR Hearing, Dr. Hilkey testified that he told Aus the records did not include Harris' psychiatric records, which would need to be specifically requested in order for him to conduct a psychological evaluation of Harris, which Dr. Hilkey recommended. Aus failed to request Harris' psychiatric records. He subsequently forgot about the medical records, an admitted oversight, and failed to use them

at trial either to prepare Defendant's witnesses or to cross-examine the State's witnesses.

As part of the MAR proceedings, the trial court ordered the release of Harris' psychiatric records from Duke University. They document psychiatric records for treatment of Harris from February 9, 1993, through February 24, 1994. In particular, on the February 9, 1993 visit, Dr. Gianturco noted that Harris reported being "[s]till depressed, don't want to go out, don't want to talk with people . . . crying spells" and that she "wishes to be dead." Subsequent records from February and March 1993 noted that she "feels more comfortable now" and "less depressed" but "continues somewhat morose." By late April, she had more energy and lacked any depressed periods. And by May she reported no headaches, nervousness, or crying spells and was "proud of what she does." She reported that her mental state had "improved tremendously" and that she recently "did well" on a treadmill test. By July, the records reflect continued improvement, with her sleeping through the night and reporting feeling "enthusiastic and interested." Dr. Gianturco reported to Dr. Johnson, her treating physician, that Harris was "totally rejuvenated." However, in an August 26, 1993, letter to lawyers about her condition (presumably for purposes of some type of litigation), Dr. Gianturco reported that Harris had "minimal improvement," had "good days and bad days," and would "need to

take medications and have some supportive psychotherapy for the rest of her life." (MAR Hearing, Def.'s Ex. 1.)

By October 27, 1993, by contrast, her psychiatrist reported that Harris was "doing very well" and "feels good about herself," describing her own state being "like a burden lifted from my shoulders." (Id.) The last record is dated February 24, 1994, and notes that Harris was "euthymic," meaning not depressed, and "is sleeping well," and "looks forward to each day." (Id.) She was ordered to return in three to four months, but there is no record that she did. (Id.) It appears that throughout most or all of this entire time period, Harris remained on prescription anti-depressants. (Hereinafter, Harris' medical and psychiatric records are collectively referred to as "the Records").

At the MAR Hearing, Scanlon presented several experts to explain and opine on the effect of the Records: Dr. James Tcheng ("Dr. Tcheng"), a cardiologist at Duke University Medical Center; Dr. Page Hudson ("Dr. Hudson"), a forensic pathologist and former chief medical examiner for the State of North Carolina; Dr. Louis Levy ("Dr. Levy"), a medical examiner and regional forensic pathologist at Nash County General Hospital in North Carolina; Dr. Gloria Coleman ("Dr. Coleman"), a clinical psychologist who teaches seminars on suicidology; and Dr. Arthur Prange ("Dr. Prange"), the former Chair of the University of

North Carolina at Chapel Hill Department of Psychiatry and former Editor of the journal <u>Depression</u>. Dr. Thompson and Dr. Harris also testified, as did Dr. Hilkey.

After the MAR Hearing, the trial judge entered a Memorandum Opinion and Order in which he found that Trial Counsel were ineffective with respect to the capital phase and granted Scanlon a new sentencing proceeding but denied a new proceeding as to the guilt/innocence phase of his trial and rejected Scanlon's prosecutorial-misconduct claim.[2] (<u>State v. Scanlon</u>, N.C. Ct. App. Docket No. 05-119, R. on Appeal at 980-1054.) In a separate order, the trial judge barred Trial Counsel from any further representation of any indigent defendant facing the possibility of a death sentence. (<u>State v. Scanlon</u>, N.C. Ct. App. Docket No. 05-119, R. on Appeal at 1070-72.)

Scanlon appealed, but the North Carolina Supreme Court denied his requests for review and a new trial without prejudice. <u>State v. Scanlon</u>, 600 S.E.2d 463, 463 (N.C. 2004). Resentencing proceeded, and the State elected not to seek the

---

[2]  At sentencing, the prosecution had to prove "aggravating circumstances" in order for Scanlon to receive the death penalty. The jury found that Harris' murder was "especially heinous, atrocious, or cruel." The prosecution's argument for this aggravating circumstance was that Harris would have felt "air hunger" lasting a minimum of 30 seconds or up to a minute, which would have been psychologically terrifying to Harris, brutally painful for an extended period of time, and would have required Scanlon to actively hurt Harris the whole time. The trial judge concluded that the medical records could have effectively been used to show that due to Harris' heart condition, she likely would have lost consciousness very quickly, nullifying the aggravating circumstance argued by the prosecution.

death penalty. The trial court resentenced Scanlon to life imprisonment without parole. (State v. Scanlon, N.C. Ct. App. Docket No. 05-119, R. on Appeal at 1239-40.) Scanlon appealed to the North Carolina Court of Appeals, raising multiple objections. In a unanimous decision, it affirmed Scanlon's convictions and sentences, in part, but vacated the felonious-possession charges as being duplicitous of the convictions for felonious larceny. State v. Scanlon, 176 N.C. App. 410, 415, 626 S.E.2d 770, 775 (2006). The North Carolina Supreme Court subsequently denied Scanlon's request for review. State v. Scanlon, 360 N.C. 543, 543, 635 S.E.2d 52, 52 (2006).

Scanlon filed a petition for a writ of habeas corpus in this court. (Doc. 1.) The matter was referred to the Magistrate Judge, and both parties moved for summary judgment. (Docs. 10, 17.) The Magistrate Judge issued a Report and Recommendation, recommending that the State's motion for summary judgment be granted and Scanlon's habeas petition be denied. (Doc. 22 at 45.) The Report concluded, among other things, that Trial Counsel's representation during the guilt phase was deficient and, while the question was a "close one," the deficient representation did not constitute prejudice within the meaning of Strickland. (Doc. 22 at 21-23.) Scanlon has filed objections to the Report and Recommendation. (Doc. 26.) The court entertained oral argument on the objections on November

12

18, 2009, and requested supplemental briefing, which has been supplied.

This court reviews all objections *de novo*. 28 U.S.C. § 636(b)(1)(C). All objections have been carefully considered, and those which warrant discussion are addressed below. The Magistrate Judge's Recommendation is hereby adopted, as modified by this Memorandum Opinion and Order.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate upon a showing "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). No genuine issue of material fact exists if the nonmoving party fails to make a showing sufficient to establish the existence of an essential element of its case as to which it would have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). When ruling on a motion for summary judgment, a court "is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party bears the burden of initially "demonstrat[ing] the absence of a genuine issue of material

fact." <u>Celotex</u>, 477 U.S. at 323. Once the moving party has carried its burden, the nonmoving party must present specific facts which show more than some "metaphysical doubt" that a genuine issue of material fact requires trial. <u>Matsushita</u>, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Id.</u> at 587 (quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)). Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." <u>Mitchell v. Data Gen. Corp.</u>, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

The normal standard for assessing a summary judgment motion does not always apply in the habeas context, although habeas cases are still subject to a summary judgment analysis as in any other civil case. <u>See</u> Rules Governing Section 2254 Cases in the United States District Courts, Rule 12; <u>see also</u> <u>Maynard v. Dixon</u>, 943 F.2d 407, 412-13 (4th Cir. 1991) (stating that Fed. R. Civ. P. 56 applies to habeas proceedings). Notwithstanding summary judgment standards, the court must examine the provisions of 28 U.S.C. § 2254 in determining whether habeas relief is proper.

Scanlon seeks a writ of habeas corpus pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

28 U.S.C. § 2254(d). (Doc. 18.) Under section 2254(d)(1), an application for a writ of habeas corpus shall not be granted unless the state court adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[3] 28 U.S.C. § 2254(d)(1). A state court "unreasonably applies" Supreme Court law when it "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000)

---

[3] The Supreme Court has noted that these two clauses have independent meaning and provide independent bases for habeas relief. <u>See</u> <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002). A federal habeas court may grant relief under the "contrary to" clause if

> the state court applies a rule different from the governing law set forth in [Supreme Court precedent], or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts. The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case.

<u>Id.</u> (citation omitted). Habeas claims alleging ineffective assistance of counsel "may be granted only if the state-court decision unreasonably applied the more general standard for ineffective-assistance-of-counsel claims established by <u>Strickland</u> . . . . [a]nd, because the <u>Strickland</u> standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." <u>Knowles v. Mirzayance</u>, ____ U.S. ____, 129 S. Ct. 1411, 1419-20 (2009). Thus, where the petitioner claims the state court misapplied <u>Strickland</u> to a set of facts that is materially different from any on which the Supreme Court has previously ruled, the "unreasonable application" clause should be applied as opposed to the "contrary to" clause. <u>See</u> 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 32.3, at 1606-07 (5th ed. 2005).

(O'Connor, J.). "[T]he state court's decision must have been more than incorrect or erroneous[,] . . . [it] must have been 'objectively unreasonable.'" Wiggins v. Smith, 539 U.S. 510, 520-521 (2003) (citation omitted). An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams, 529 U.S. at 410 (O'Connor, J.).

Here, Scanlon objects to the Magistrate Judge's determination that the North Carolina Court of Appeals' decision — finding Trial Counsel's failure to use the Records at trial did not constitute ineffective assistance of counsel — was not an unreasonable application of clearly established federal law. (Doc. 26.) Scanlon claims that the state court unreasonably applied the Supreme Court's clearly established law regarding the Sixth Amendment right to effective assistance of counsel.[4] (Doc. 1, Attach. 2.)

In Strickland, the Supreme Court established two prongs a petitioner must satisfy in an ineffective-assistance-of-counsel claim. First, the petitioner "must show that counsel's performance was deficient." 466 U.S. at 687. Second, he must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable

---

[4] "[A] state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)." Strickland, 466 U.S. at 698.

probability is a probability sufficient to undermine confidence in the outcome." Id. In other words, "the [petitioner] must show that the deficient performance prejudiced the defense." Id. at 687.

In this case, the trial court identified the issue as being whether Trial Counsel's conduct violated Scanlon's constitutional rights based on ineffective assistance of counsel. See Scanlon, 176 N.C. App. at 439-40, 626 S.E.2d at 789-90 (quoting trial court findings). On the first Strickland prong, the trial court concluded that the evidence, "though minimal in many regards, shows a reasonably sufficient investigation by [Trial Counsel]," noting that Trial Counsel reviewed Harris' medical records for content, tabbed them (highlighting her depression, anxiety and hypertension), and interviewed Drs. Thompson and Rudner about a suicide theory. Id. at 440, 626 S.E.2d at 790. As to the second Strickland prong, the court held alternatively that even if performance were deficient, the use of the Records at trial "would not have likely bolstered the defense, at least to any significant degree" because "the defense strategy clearly was to attempt to create reasonable doubt about the cause of Ms. Harris' death by suggesting that [she] died either: (1) naturally, as a result of a cocaine-induced heart attack while engaged in some unspecified sexual activity; or, (2) accidentally, by sexual asphyxiation

from the plastic bag wrapped around her head." Id. at 440, 626 S.E.2d at 790. The trial court also found that "[t]he severity of Ms. Harris' heart condition was substantially before the jury."[5] Id.

The North Carolina Court of Appeals properly noted that the ineffective-assistance claim was controlled by the standards of Strickland. Id. at 439, 626 S.E.2d at 789. The court of appeals reviewed the trial court's findings as to Trial Counsel's investigation and concluded that they were supported by competent evidence. Id. at 441, 626 S.E.2d at 790. The court of appeals focused on the fact that Trial Counsel reviewed the Records and interviewed Dr. Thompson. Id. Further, the court of appeals held that the trial court "did not err in concluding that, even if [T]rial [C]ounsel's actions were objectively unreasonable, Defendant was not prejudiced concerning the defense counsel's use or non-use of Ms. Harris' medical records or any other alleged failures." Id. at 442, 626 S.E.2d at 791. The court concluded that even if Trial Counsel's actions were objectively unreasonable, Scanlon was not prejudiced because the decision not to pursue a suicide defense was "a defense strategy that cannot be second-guessed on appeal." Id.

---

[5] At no point did the trial court find that Trial Counsel's failure to use the records was itself a strategic decision.

The Magistrate Judge disagreed with the court of appeals and found Trial Counsel's actions objectively unreasonable. (Doc. 22 at 20.) The Magistrate Judge did not agree that the failure to utilize the Records was a strategic decision by Trial Counsel.[6] (Id.) He concluded, nevertheless, that while Trial Counsel was deficient, there was no reasonable probability that the jury would have returned a not guilty verdict based on the other record evidence. (Id. at 22.)

While AEDPA does not require a federal habeas court to adopt a particular methodology in evaluating the claim, Lockyer v. Andrade, 538 U.S. 63, 71 (2003), it is considered logical and consistent with previous Supreme Court precedent for a federal court to adjudicate a habeas corpus claim by first analyzing the merits of the federal constitutional claim and only then assessing whether § 2254(d)(1) precludes the granting of habeas

_____

[6] Under section 2254(d)(2), a writ of habeas corpus may also be granted if the state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Factual determinations made by the state court are presumed to be correct and are only rebutted by a showing of clear and convincing evidence. 28 U.S.C. § 2254(e)(1). A state court "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, ___ U.S. ___, 130 S. Ct. 841, 849 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Id. (quoting Rice v. Collins, 546 U.S. 333, 341-42 (2006)). In the present case, although the court of appeals' finding that failure to use the Records was a strategic decision is suspect as a factual finding on this record, it does not affect the outcome of this habeas petition because the issue turns ultimately on the analysis of the independent issue of prejudice.

corpus relief. <u>See</u>, <u>e.g.</u>, <u>Penry v. Johnson</u>, 532 U.S. 782 (2001); <u>Weeks v. Angelone</u>, 528 U.S. 225 (2000); <u>Ramdass v. Angelone</u>, 530 U.S. 156 (2000); <u>see also</u> 2 Hertz & Liebman, <u>supra</u>, § 32.3, at 1614-15 (citing cases). Thus, the court will first analyze Scanlon's ineffective-assistance-of-counsel claim under <u>Strickland</u> and then determine whether the outcome of the state court proceeding was an "unreasonable application" of that law.

## B. Ineffective Assistance of Counsel Under <u>Strickland</u>

### 1. Deficient Performance

The first prong of the <u>Strickland</u> test requires a petitioner to "show that counsel's performance was deficient." <u>Strickland</u>, 466 U.S. at 687. A counsel's performance is deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> A petitioner must show that "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688. A petitioner must also "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Id.</u> at 689 (internal quotation marks omitted). The review of counsel's performance is highly deferential, and "a court must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance[.]" <u>Id.</u> When counsel's conduct is challenged for failing to present certain evidence, the inquiry generally focuses on whether the investigation supporting counsel's decision not to present the evidence was reasonable. <u>Wilson v. Ozmint</u>, 352 F.3d 847, 860 (4th Cir. 2003).

The Magistrate Judge concluded that Trial Counsel's performance was deficient because Trial Counsel failed to follow through and turn the Records over to a medical expert. (Doc. 22 at 19-20.) The Magistrate Judge noted that the Records would have aided defense experts and been useful in cross-examining the State's witnesses to support the defense theory that Harris' death was not a homicide by showing the possibility that she died either as a result of her heart condition or by committing suicide. (<u>Id.</u>) This court agrees.

One of Trial Counsel's theories of defense rested upon showing that Harris was not murdered, but rather died as a result of her heart condition or suicide. (MAR Tr. at 284-85.) Aus admitted that he reviewed the medical records and tabbed them for future use. (<u>Id.</u> at 77.) He gave the medical records to Dr. Hilkey, who, according to Aus, reviewed them and told Aus they were not of much use; according to Hilkey, he advised that

Aus should seek the actual psychiatric records.[7] (Id. at 505, 954.)  Importantly, Aus testified that his failure to use the Records was not a strategic choice but rather an oversight (id. at 279) and that, in the excitement of the trial, he simply forgot about them (id. at 282).  He noted that he had no strategic reason for failing to use the Records to rebut the State's minimization of Harris' medical condition as someone who was "functioning fine, fine, with her coronary problem" (Trial Tr. at 4066), or for failing to use them to further a defense of suicide or accidental death or object to testimony by state witnesses (MAR Tr. at 283-88).

The Records would have furthered Trial Counsel's defense as to the cause and manner of Harris' death.  As to cause of death, they would have supported the theory that Harris died from her heart condition.  They could have substantially bolstered the credibility of Scanlon's sole medical expert, Dr. Harris, whose theory that Harris died as a result of a heart attack was attacked by the prosecutors at trial on the grounds that he had

_____

[7]   It is disputed whether Dr. Hilkey told Aus the records were of any further use.  Aus gave Dr. Hilkey a copy of Harris' medical records, without the psychiatric records, to see if he had any advice regarding possible defenses.  (MAR Tr. at 505.)  Dr. Hilkey testified that he told Aus that he would need additional materials, specifically Harris' psychiatric records, to further investigate the possibility of a depressive episode or series of episodes and subsequent treatments. (Id. at 954.)  Aus testified that Dr. Hilkey had told him that it was a "dead end" to try and work up a psychological profile of Harris. (Id. at 510.)  The MAR trial judge noted these two conflicting stories but did not make a factual finding as to which one was correct or more credible.

not seen Harris' medical records.  (Trial Tr. at 3753.)  By showing Dr. Harris the significant history of Harris' right-sided heart disease, also known as congestive heart failure, as well as the other conditions she suffered that were potentially detrimental to her heart, the Records would have given Dr. Harris a better medical foundation upon which to develop his testimony that Harris died as a result of her heart condition. It was deficient of Trial Counsel to fail to properly prepare and give Dr. Harris this necessary foundation for his opinion. See, e.g., Bean v. Calderon, 163 F.3d 1073, 1079 (9th Cir. 1998) (finding counsel's representation objectively unreasonable because experts at trial were neither properly prepared nor given necessary requested information to establish a foundation for their opinion).

The Records also would have provided a basis to cross-examine Dr. Thompson, the State's lone medical expert, regarding his opinion and testimony that Harris' heart condition (which was described as coronary artery disease) did not contribute to her death.  Trial Counsel could have pointed to her congestive heart failure and recent hospitalization as evidence of how serious her heart disease had become.

As to manner of death, even assuming Trial Counsel's failure to use the Records to advance a suicide defense can be

considered a strategic decision, such a judgment was not reasonable. The Court noted in <u>Strickland</u>:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91. Therefore, the focus is on whether the *investigation* supporting Trial Counsel's decision not to use the Records to support a suicide defense *was itself reasonable*. <u>See</u> <u>Williams</u>, 529 U.S. at 415 (O'Connor, J.) (noting counsel's duty to conduct the "requisite, diligent investigation" into his client's background).

Here, Trial Counsel's investigation into a suicide theory was not reasonable. Trial Counsel discussed the possibility of a suicide defense with three people before the trial. First, Trial Counsel approached Dr. Thompson, the State's primary expert medical witness, about whether he thought suicide was a viable option. Dr. Thompson "insisted . . . that [Harris'] death was homicide" and became uncooperative when Trial Counsel mentioned the possibility of a sexual asphyxiation theory. (MAR

24

Tr. at 454.)  However, as noted in the next section, once Dr. Thompson was shown the Records after trial he conceded he was unaware of Harris' twenty-year treatment for anxiety and depression and would have "considered" "suicide" or "undetermined" as a cause of death had he been made aware of them before trial.  (State v. Scanlon, N.C. Ct. App. Docket No. 05-119, R. on Appeal at 541-42 ¶ 6 ("Thompson Aff.").)

Second, Trial Counsel interviewed Dr. Glenn Rudner ("Dr. Rudner") of the State medical examiner's office, who actually performed the autopsy on Harris, which Dr. Thompson supervised. (MAR Tr. at 800.)  Dr. Rudner told Trial Counsel that based on the autopsy, he could not rule out suicide as a possible manner of death, although he agreed with Dr. Thompson that asphyxia was the cause of death.  (Id. at 803.)

Third, Trial Counsel discussed the possibility of suicide with Dr. Hilkey, as noted above.  Trial Counsel's discussion with Dr. Hilkey is also insufficient to establish a reasonable investigation.  If Dr. Hilkey told Trial Counsel that he needed the psychiatric records to decide the feasibility of such a defense, then Trial Counsel unreasonably failed to obtain them. If Dr. Hilkey told Trial Counsel that such a defense was not feasible, then Trial Counsel sought Dr. Hilkey's opinion based on incomplete information as Dr. Hilkey's opinion was given absent the psychiatric records even though the medical records

clearly reflect that Harris was being treated separately by Dr. Gianturco, a psychiatrist.

Further, as in _Wiggins_, Trial Counsel's failure to follow up resulted from oversight and inattention. Aus testified that suicide was a theory of defense (_id._ at 284-85), and it was an oversight not to utilize the Records (_id._ at 282). Dr. Hilkey testified that after asking for the lawyers to request Harris' psychiatric records, he did not receive any further records. (_Id._ at 955.) Also, Trial Counsel did present some evidence at trial regarding a possible suicide, including statistics regarding suicides that utilized plastic bags (Trial Tr. at 3824-54), as well as mentioning suicide and accident in the closing argument as possible ways Harris might have died (Trial Tr. at 3998-99). A reasonable investigation would have involved seeking out the psychiatric records and showing the Records to competent professionals to evaluate their potential usefulness. Thus, the decision, even if conscious, cannot be strategic because it was based on inadequate investigation. _Cf. Rompilla v. Beard_, 545 U.S. 374, 389-90 (2005) (concluding that a decision not to pursue certain mitigating evidence cannot be strategic if it is based on inadequate investigation). Without reviewing (directly or with an expert) the psychiatric records,

Trial Counsel had no strategic reason to believe that further investigation into a suicide theory was unnecessary.[8]

Accordingly, with due respect for the difficulty of preparing for trial and an aversion toward 20/20 hindsight, the court finds Trial Counsel's representation fell "below an objective standard of reasonableness." Strickland, 466 U.S. at 688; see, e.g., Hovey v. Ayers, 458 F.3d 892, 909 (9th Cir. 2006) (noting that counsel's failure to follow up on information contained in files key to the prosecutors' case fell below an objective standard of reasonableness); Garrison v. Ward, No. CIV 04-218-S, 2007 WL 2409732 (E.D. Okla. Aug. 20, 2007) (finding counsel's performance fell below an objective standard of reasonableness when he failed to utilize defendant's medical and mental health records at trial to support the theory that the defendant was unable to form the requisite intent for murder).

---

[8] The present case is distinguishable from Byram v. Ozmint, 339 F.3d 203 (4th Cir. 2003). In Bryam, the Fourth Circuit observed that the reasonableness of an investigation or decision by counsel that further investigation is not necessary must be considered in light of the scarcity of counsel's time and resources. 339 F.3d at 210. The court found that counsel's decision not to seek the defendant's adoption records was reasonable because counsel had thoroughly investigated the defense that would have utilized them and concluded there was not enough of a factual basis to present that defense. Id. Here, Trial Counsel conducted no such thorough investigation into the suicide line of defense. Even in light of the rigors of preparing for a capital trial and the accompanying time constraints, it would have been difficult for Trial Counsel to conclude that seeking Harris' psychiatric records would not benefit the defense, especially where that defense was in fact offered at trial.

### 2. Prejudice

The more difficult question is whether Trial Counsel's failure to use the Records prejudiced Scanlon. <u>Strickland</u> mandates that a petitioner show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. To assess reasonable probability, the court considers the totality of the available exonerating evidence — both the evidence adduced at trial, and the evidence adduced in the habeas proceeding — and reweighs it against the evidence of guilt. <u>See Porter v. McCollum</u>, ___ U.S. ___, 130 S. Ct. 447, 453-54 (2009) (citing <u>Williams</u>, 529 U.S. at 397-98, and deciding in context of sentencing phase). Under this approach, a court must weigh the evidence of guilt against the evidence of reasonable doubt. A verdict that was "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." <u>Strickland</u>, 466 U.S. at 696.

The Magistrate Judge found that while Trial Counsel's representation was deficient, there was not a reasonable probability that had Trial Counsel utilized the Records the jury would have returned a not-guilty verdict. (Doc. 22 at 22.) The Magistrate Judge based this conclusion on evidence suggesting that Scanlon had been to Harris' house within the timeframe of her death and had stolen her belongings, that Harris was scared

of Scanlon, and that Scanlon had previously threatened to kill Harris. (Id. at 22-23.) Scanlon argues that had Trial Counsel fully utilized the Records, there is a reasonable probability that one or more jurors would have entertained a reasonable doubt as to the manner, method, or cause of Harris' death, thus resulting in a different outcome in the proceedings. (Doc. 26, Attach. at 6.)

The court first looks at the evidence of Scanlon's guilt. The evidence shows that Scanlon was in Harris' house and stole her belongings. Scanlon was arrested in New York in possession of Harris' credit cards after her death. (Trial Tr. at 2892-94.) He admitted to driving Harris' car from North Carolina to New Orleans where he abandoned it. (Id. at 3684-93.) Scanlon pawned a gold nugget ring similar to one that went missing from Harris' house on the day of her death. (Id. at 2327-29, 2370-71.) Police found his head hairs on Harris' pillow case (id. at 3550), her comforter (id. at 3549), her bed sheet (id. at 3548), and in her car (id. at 3545). Additionally, police found one of his pubic hairs on her bed (id. at 3551) and a cigarette butt with saliva matching Scanlon's in the house (id. at 3404-06). The belongings in Harris' bedroom were also ransacked, including the presence of boxes and mounds of covers over Harris' body on her bed. This evidence points to Scanlon's guilt for the

various theft-related charges and puts him at the scene close in time to Harris' death.

The prosecution presented evidence of ill will between Scanlon and Harris. Harris had threatened to bring criminal charges against Scanlon for stealing and misusing her credit cards and checks. (Id. at 2045-48.) There was testimony that Scanlon threatened to kill Harris (id. at 2218) and that Harris was afraid for her safety as a result of the threat (id. at 2045). Harris had even shot at Scanlon, had sought to change the locks on her house because she believed that Scanlon had a house key (id. at 2046, 2137), and had asked her nephew and his girlfriend to move in with her for protection (id. at 2045).

At trial, Dr. Thompson testified that the cause of death was asphyxia due to the plastic bag wrapped around Harris' head. (Id. at 2678.) He testified that a bruise found on Harris' face could have been caused by a fist. (Id. at 2690.) He concluded that the manner of death was homicide. (Id. at 2682.) Further, Scanlon's own expert, Dr. Harris, testified that another person likely tied the knot in the plastic bag (id. at 3749-50) and placed the bedding covers on top of Harris' body (id. at 3750).

There was evidence at trial that an overhand knot was tied in the plastic bag wrapped around Harris' head. However, the existence of the knot at the crime scene was a contested fact. Scanlon argues that there was no knot when Harris' body was

found; rather, it was tied later. (Doc. 1, Attach. 2.) However, at trial, the first crime scene investigator at the scene testified that he saw a knot in the plastic bag. (Trial Tr. at 2466.) The inference created at trial was that Harris could not have tied the knot in the bag herself, thus someone else must have been in the room and placed the plastic bag over her head. There was sufficient evidence to support the State's contention, and thus the jury's conclusion, that the knot was present in the bag at the time Harris was found.

In short, the trial record contains substantial evidence that supports the conclusion that Scanlon expressed a motive to kill Harris, went to her house around the time of her death, had an altercation with Harris that bruised her, suffocated her by placing a plastic dry-cleaning bag over her head, stole some of her belongings, and left in her automobile.

In turn, this evidence must be weighed in light of the Records and all other exonerating evidence. Williams, 529 U.S. at 397-98. At trial, Trial Counsel disputed the prosecution's contention that Harris was murdered, arguing instead that she died as a result of an accident (the autoerotic asphyxiation defense) because of a pre-existing heart condition, or suicide. (MAR Tr. at 284-85). As noted below, the Records would have benefited both of these defenses.

### a. Heart Condition

At trial, aspects of Harris' heart condition were before the jury. The jury was told that Harris had gone to the hospital in December 1995 because she "became ill", but was told no further specifics of her condition at that time. (Trial Tr. at 2089-90.) There was evidence presented that Harris was on short-term disability because of her heart condition.[9] (Id. at 2102-03.) Dr. Thompson testified that Harris had severe coronary artery disease, had likely suffered from a heart attack in the past, and had undergone coronary bypass surgery. (Id. at 2714-16.) He also testified that cocaine would have had a bad effect on anyone with a heart condition. (Id. at 2716.) He nevertheless stated that the existence of her *coronary artery* condition would not change his opinion as to the cause and manner of Harris' death. (Id. at 2723-24.) In addition, Dr. Thompson testified that after Harris' bypass surgery, "certainly she would have been able to likely function normally." (Id. at 2724.) However, Dr. Thompson never reviewed Harris' medical records prior to the trial and was unaware of her hospital visit in December 1995. (Thompson Aff. ¶ 5.)

---

[9] At trial, Barbara Breeden testified that Harris was not on full-time disability, that Harris thought she was unhealthy enough to be considered disabled but that the Social Security Administration disagreed. (Trial Tr. at 2102-03.) However, at the MAR Hearing, Breeden testified that after Harris' death, she had received close to $30,000 from Social Security for disability benefits. (MAR Tr. at 1018.) Also, the Records revealed that Harris was on 100% disability since 1990 due to her coronary artery disease.

On the other hand, Dr. Harris testified at trial that Harris had likely died as a result of her heart condition that was complicated by new clots and the presence of cocaine. (Id. at 3742.) The prosecution seriously undermined Dr. Harris' testimony by eliciting his admission that he had neither received nor reviewed any of Harris' medical records. (Id. at 3753.) The State's closing argument ridiculed Dr. Harris' theory that Harris could have died from her heart condition, claiming she was "functioning fine, fine with her coronary problem" and had surgery "to correct her problem" (id. at 4066) and that the theory that she died of a heart attack "came from another planet" and was "[e]xtremely incredible" (id. at 4064).

At the MAR Hearing, Scanlon called multiple medical experts to testify as to the condition of Harris' heart. Dr. Tcheng reviewed the Records and testified in an affidavit that in addition to coronary artery disease, Harris had congestive heart failure/right-sided heart disease. (MAR Tr. at 305; State v. Scanlon, N.C. Ct. App. Docket No. 05-119, R. on Appeal at 545-47, Tcheng Affidavit at 2-3 ("Tcheng Aff.").) He testified that it would be a misrepresentation to say that Harris' "cardiac disease had been corrected by surgery, or was controlled by medication, or that her health was in any respect good[.]" (MAR Tr. at 308.) In his opinion, Harris' heart condition made her a perfect candidate for sudden death, and the presence of cocaine

and oxygen deprivation created "the perfect environment for sudden death." (Id. at 311-12.)

He also testified that Harris' hospitalization on December 28, 1995, for chest pain suggested her "situation was more grave than being carefree or healthy," as patients who redevelop chest pain after bypass surgery have a "dramatically higher" chance of dying over the next six months than those patients who are otherwise stable. (Id. at 308-09.) Dr. Tcheng could not unequivocally state that Harris died as a result of a cocaine-induced heart attack, only that asphyxiation was not the only possibility of how she died because her heart was also a "smoking gun," which could have been secondary to asphyxiation. (Id. at 361-62.) He testified that the autopsy report and her medical records suggested several possibilities of how Harris died: that the fresh blood clot in the bypass graft going to the left anterior descending distribution killed her (id. at 331); given her degree of heart disease, she died suddenly from a primary dysrhythmia (id. at 331); or that the presence of cocaine in her system caused a blood clot that killed her (id. at 332).

In his affidavit, Dr. Tcheng stated that "Harris' medical records contradict any representation tending to minimize the severity of her medical condition in the months prior to her death, including any representation that her cardiac disease had

been 'correct[ed]' by surgery, that the disease was controlled by medication, that she was functioning 'fine,' or that her health was in any respect 'good'." (Tcheng Aff. ¶ 3.) He stated that her disease was "severe, degenerative, and had life-threatening potential at any time" (id. ¶ 4), and that she was a perfect candidate for sudden death (id. ¶ 5). He suggested that Harris' medical records "support the conclusion" that she suffered sudden death induced by cocaine "either directly[,] by causing a primary ventricular dysrhythmia[,] or indirectly[,] by causing acute thrombosis of the vein graft, acute myocardial infarction and a terminal ventricular dysrhythmia[]." (Id. ¶ 7.) In other words, as he testified at the MAR Hearing, the degree of Harris' heart condition could have caused her death, without any clot. (MAR Tr. at 331.)

Dr. Hudson testified that Harris' ingestion of cocaine would be very dangerous with her heart condition and that the combination of the heart condition, the cocaine, and the likely oxygen deprivation through the use of the plastic bag would significantly increase her risk of sudden death. (Id. at 217-18.) He testified that the Records showed Harris "was still in a very dangerous situation as far as life expectancy was concerned" after her bypass surgery (id. at 214) and that her hospitalization in December 1995 was an indicator that "the heart disease was at least still there, if not getting worse"

35

(id. at 219). In his opinion, "cocaine . . . would be just about as dangerous as anything I can think of to her heart." (Id. at 217.) He stated in his affidavit that "the medical records contradict any representation tending to minimize the severity of [Harris'] medical condition in the months prior to her death, including any representations that her cardiac disease had been 'correct[ed]' by surgery, that this disease was controlled by medication, that she was functioning 'fine', or that her health was in any respects 'good.'" (State v. Scanlon, N.C. Ct. App. Docket No. 05-119, R. on Appeal at 543 ¶ 3 ("Hudson Aff.").) He stated that "[g]iven [her] medical history . . . Harris had been a perfect candidate for sudden death in the absence of cocaine use or hypoxemia (oxygen deprivation). The introduction of either or both of the latter two factors would have increased her risk of sudden death." (Id. ¶ 5.) He viewed Harris' hospitalization on December 28, 1995, as an indicator "that her condition was worsening shortly before her death." (Id. ¶ 6.)

Dr. Thompson reviewed Harris' medical records and concluded that the existence of her bypass condition would not have changed his opinion that asphyxiation was the cause of death. (MAR Tr. at 1183.) However, Dr. Thompson based his opinion on the facts of the scene. (Id. at 1223.) In his affidavit, Dr. Thompson clarified that when he testified at trial that Harris

"would have been able to likely function normally" after her bypass surgery, which is "generally the point of that [type of] surgery", he did not mean that the surgery had corrected her heart condition. (Thompson Aff. ¶ 3.) He further stated that "[b]ecause Ms. Harris' heart disease was severe and degenerative, she was a perfect candidate for sudden death at any time in the absence of cocaine or oxygen deprivation. The presence of either or both of those stressors would have increased the risk of sudden death." (Id.)

Dr. Louis A. Levy, a clinical and forensic pathologist, testified at the MAR Hearing that Harris had "severe coronary artery disease" that was "complicated by longstanding hypertension." (MAR Tr. at 145.) She was a "good candidate for sudden death by means of a heart attack." (Id.) He opined that her coronary bypass surgery "alleviated" but did not correct her condition. (Id.)

### b. Suicide

Trial Counsel did not develop a robust suicide defense at trial, relying rather on the autoerotic asphyxiation defense. Trial Counsel did present the testimony of Patricia Barnes, the information systems coordinator of the Office of the North Carolina Chief Medical Examiner, who provided statistics as to deaths by asphyxia, broken down by suicide and homicide. (Trial Tr. at 3822-39.) She testified that in 1996 and 1997, forty-

nine and fifty-four asphyxiation deaths were reported, respectively, of which five and two were by plastic bag, respectively. (Id. at 3824.) She testified that of the asphyxiation deaths, seven in 1996 and twelve in 1997 were homicides (there being no information as to how many were by plastic bag). (Id.) She reported that there were ten suicides by asphyxiation in 1996 and nine in 1997. (Id. at 3825.)[10] In closing arguments, Trial Counsel raised suicide as a possible defense. (Id. at 3998-99.)

Additional evidence to support the suicide defense was presented at the MAR Hearing.

Dr. Coleman reviewed the Records and pointed out Harris' significant suicide risk factors: chronic depression (MAR Tr. at 670); anxiety (id. at 672); passive suicide (id. at 673); chronic health problems (id. at 681); cocaine use (id. at 682); and significant conflict in her life (id. at 684). He noted that Harris had recently exhibited behavior consistent with suicide risk factors, including recently closing business bank accounts, indicating she was "taking care of things" (id. at 685), and recently stopping to care for her appearance (id. at

---

[10] Dr. Hilkey (as noted earlier, a licensed and forensic psychologist) testified for Scanlon, but he testified only that in his opinion Scanlon did not fit the personality profile of "someone who is violent or has capacity to engage in the crimes of aggression toward other people." (Id. at 3849.) On cross examination, the prosecutor examined Dr. Hilkey as to a demand note used by Scanlon in a prior bank robbery that read, "Put money in the bag or you're dead." (Id. at 3865.)

693-94). Further, Harris' sister recently confronted her about possible drug use (id. at 688), which the autopsy revealed was true. Dr. Coleman also testified that making plans post-suicide does not indicate that a person is not suicidal (id. at 710), and it is more common that a suicide note is not left (id. at 718). She further testified that death by asphyxiation through the use of a plastic bag is a well-known form of suicide. (Id. at 679.) However, at the end of the day she conceded that she could not say "with any degree of certainty" that Harris was suicidal. (Id. at 727.)

In the pre-trial investigation, Trial Counsel interviewed Kim Senter, a former tenant of Harris', who said that Harris tried to commit suicide in December 1995 by purposefully failing to take her medication. Barbara Breeden, Harris' sister, confirmed that Harris was rushed to the emergency room in December 1995, according to Harris, for not having taken her potassium pills. (Id. at 1051-53.) No further testimony was given that this failure was a suicide attempt, as Kim Senter never testified at either the trial or the MAR Hearing. Dr. Coleman testified that it is common for older people to attempt suicide by failing to take their medication and so she assumed, for purposes of her analysis, that this was a suicide attempt by Harris. (Id. at 673-74.)

Dr. Prange testified that Harris' depression, heart disease and cocaine presented a "toxic triangle" in Harris' life. (Id. at 1348.) He considered Harris to have a "very substantial risk of suicide" due to these risk factors. (Id. at 1350.) Dr. Prange viewed Harris' last conversation with Barbara Breeden as a "hint" towards suicide. (Id. at 1356.) In her last conversation with Harris, Breeden told Harris that she "was worried about her loss of interest in her appearance . . . [and] generally her behavior was not like it used to be" and "asked if she were using drugs." (Id. at 1022.) Harris responded that she was just worn out with people stealing her checks and credit cards and having to stop payments and report stolen credit cards, that "she didn't see how she could take much more," but that "things were going to get better, and not to worry." (Id.)

Dr. Prange also testified that the combination of cocaine and the plastic bag "strongly suggests to me that suicide was the manner of her death." (Id. at 1363.) He did not view the bedding found on top of Harris' body as inconsistent with suicide. (Id. at 1359-60.) He believed that Harris' refusal to go to the hospital and receive treatment in December 1995, despite traditionally being "scrupulous in keeping medical appointments [and] taking care of herself in the face of deteriorating health over a long period of time", was an

"untoward sign" that Harris had a "temptation to give up." (Id. at 1358.)

Dr. Levy "concluded that [he] didn't see satisfactory anatomic evidence, or clinical evidence, or evidence from the scene of the materials to make a decision that . . . a homicide had occurred." (Id. at 133.) Dr. Levy stated that "it was very difficult to separate a natural [death] from an accident from a suicide, but I settled on a suicide as being most likely [the cause of death]." (Id. at 133.) He saw "no reason to call [Harris' death] a homicide." (Id. at 151.) His opinion was based on his review of the trial and MAR transcripts, the Records, and the combination of the plastic bag (which he believed Harris could have knotted herself), the presence of cocaine in Harris' blood, and lack of what he saw as any defensive injuries or evidence of attempted resistance on Harris' hands. (Id. at 133-41.) He conceded that there may be no evidence of struggle even if one had in fact occurred (id. at 155-56) and acknowledged that the bruise on Harris' face was made within six hours of her death but was superficial (id. at 135, 152). He noted the statement in the Records where in 1993 Harris told a doctor that she wished to be dead. (Id. at 188.) He conceded, however, that the pile of clothes over her body was "very unusual." (Id. at 177.)

Dr. Levy testified further that sexual asphyxiation is unusual, particularly in an elderly female, but that Harris could have put the plastic bag over her head herself. (Id. at 141.) He also noted that most people who commit suicide do not leave a note or tell anyone they are planning to kill themselves. (Id. at 178.) In the end, he acknowledged that this was "a very complex case" and when asked whether he was choosing "suicide" over "undetermined" answered: "I don't have any problem with undetermined. There are features of virtually every single manner of death in this case, and undetermined is, to use a term I've recently used, a path of least resistance, for sure, yes." (Id. at 194.)

In his affidavit, Dr. Hudson stated that "in light of the medical records, the circumstances of Ms. Harris' death are consistent with a successful suicide attempt." (Hudson Aff. ¶ 8.) He testified similarly at the MAR Hearing that Harris' death was "consistent with . . . a successful suicide attempt." (MAR Tr. at 227.) He could not rule out the possibility of homicide (id. at 259-61), testifying he "would put the manner [of death] down as undetermined" (id. at 251).

Dr. Harris testified at the MAR Hearing, without having reviewed the Records, that information that Harris had a psychiatric history "might have changed my opinion." (Id. at 375.) And if it turned out she was suicidal in the past or had

any tendency towards suicide, he said, "it might have changed my opinion quite radically. But I do not leap into the diagnosis of suicide as a differential without some kind of history." (Id. at 375.)

Dr. Thompson testified at the MAR Hearing and in his affidavit that while he maintained his opinion from trial, he would have "considered either suicide or 'undetermined' as the manner of her death" had he known of Harris' past mental problems. (Id. at 1222; Thompson Aff. ¶ 6.) However, he maintained that in his "opinion . . . the cause of death was asphyxiation, and that the manner of death was a homicide." (MAR Tr. at 1223). He testified that he would not change his opinion about manner of death without first talking to the police. (Id. at 1211.) He based his opinion, even after reviewing the Records, on the existence of the knot in the plastic bag, the facts of the scene, and the lack of a suicide note.[11] (Id. at 1223-24.) He stated in his affidavit that he testified at trial that an examination of the body alone did not allow him to rule out suicide or accident. (Thompson Aff. ¶ 2.) In his opinion, the scene and the plastic bag did not in themselves indicate a suicide. (MAR Tr. at 1224.) However, he conceded that Harris could have tied the knot herself if she had

---

[11] Law enforcement found a note Harris had apparently written to profess her feelings for Scanlon, which was ripped up on her bedside table.

wanted to do so. (Id. at 1244.) In his affidavit, he stated
that in concluding Harris' death was a homicide, he "relied on
circumstances extrinsic to the examination of the body,
including the belief of the police that the death was a
homicide." (Thompson Aff. ¶ 4.) In the end, he allowed that
"the circumstances of her death are consistent with suicide."
(Id. ¶ 6)

### 3. Evidence of Guilt Weighed With All Exonerating Evidence

To be sure, none of the evidence adduced at the MAR Hearing
calls into question the jury's conclusion that Scanlon was
present in Harris' house around the time of her death and stole
her car and other belongings, including her credit cards that he
used during his flight. But concluding that someone engaged in
a theft is quite different from concluding that he or she
committed a murder in connection with it. There is always the
possibility that Scanlon seized on an opportunity to steal
Harris' belongings once he realized she was dead, however she
died.

As to the cause of death, the Records would have permitted
a more developed defense that Harris' heart condition was more
serious than the prosecution demonstrated, with congestive heart
failure — an uncorrectable condition — being a significant issue
for Harris. Dr. Thompson, who acknowledged that Harris had a

heart condition, minimized the severity of that condition and the potential lethal consequences resulting from it. His opinion was used to contradict Dr. Harris' opinion that Harris died as a result of her heart condition. The Records would have enabled Trial Counsel to impeach Dr. Thompson's view that Harris was healthy after her surgery or that her heart had been "correct[ed]." After reviewing the Records, Dr. Thompson conceded that her heart condition was not corrected by her bypass surgery and that she was a candidate for sudden death (Id. ¶ 3), a conclusion notably different from his trial testimony.

The potential importance of the Records was highlighted by the prosecutors themselves who, in closing argument, ridiculed the defense and Dr. Harris for not reviewing the medical records (Trial Tr. at 4066-67 ("maybe if he'd looked at the medical records")) and for claiming that Harris' heart was not corrected by her surgery and thus functioning adequately. The Records would have bolstered the opinion of Dr. Harris, Scanlon's sole medical witness, that Harris' heart condition was the cause of her death and prevented the State from making a credible claim that Harris was "functioning fine" because her coronary bypass surgery had "correct[ed] her problem." (Id. at 4066.) They would have enabled Trial Counsel to show that Harris' heart condition may have deteriorated in light of her December 1995

hospital visit. And while the jury was told that cocaine would have had a negative effect on someone with Harris' heart condition (Id. at 2716), the seriousness of the lethal consequences of someone with Harris' heart condition ingesting cocaine would have been underscored.

In short, the use of the Records would have supported Trial Counsel's theory that Harris died as a result of her bad heart.[12] See, e.g., Williams v. Allen, 542 F.3d 1326, 1342-43 (11th Cir. 2008) (finding prejudice when counsel put on testimony that described defendant's childhood beatings as occasional "ordinary parental discipline," as opposed to testimony describing the beatings as "serious assaults" involving "deadly weapons" that occurred "on a near constant basis"); Bean, 163 F.3d at 1080-81 (finding counsel's combined failures at sentencing to provide experts with informational foundation for their conclusions, which severely undercut their utility to the defendant, and the failure to fully develop the seriousness of defendant's mental problems resulted in prejudice).

The more difficult issue, however, is whether prejudice as to the cause of death undermines the verdict if the presence of

_____

[12] In its opinion, the court of appeals found that the trial court's finding that "[t]he severity of Ms. Harris' heart condition was substantially before the jury" was supported by the record. Scanlon, 176 N.C. App. at 440-42, 626 S.E.2d at 790-91. This is a conclusion based on fact, as opposed to an actual factual determination. The distinction is important, for under 28 U.S.C. § 2254(e)(1), factual determinations made by the state court are presumed to be correct and are only rebutted by a showing of clear and convincing evidence.

the plastic bag cannot be explained. In other words, even assuming that Harris may have died from some form of heart failure, how does one explain the presence of the plastic bag in a fashion that would absolve Scanlon of responsibility for her death? The jury already rejected the autoerotic-asphyxiation scenario, and the court finds that it is unlikely that the Records and testimony of the MAR experts would have altered that result. Thus, Scanlon must be able to demonstrate that the Records and expert testimony undermine confidence in the verdict as to the manner of death. This is a much closer question.

Though the records show that Harris suffered from forms of depression and anxiety for over twenty years with some rise and fall in her symptoms, they reflect that she generally appeared to cope for this extended period of time through the use of various medications. Significantly, the Records note what may have been an uptick in her symptoms in February 1993, two years before her death, when Harris presented to Dr. Gianturco with night sweats, anxiety, and crying spells and expressed that she "wishe[d] to be dead." (MAR Hearing, Def.'s Ex. 1.) There is no evidence anywhere in the Records that Harris ever threatened or wished to take her life. Rather, her subsequent Records reflect a desire for treatment and a general improvement in her condition. This is colored only by Dr. Gianturco's August 26, 1993 letter to her lawyers (presumably relating to a claim for

benefits) in which he softens the improvement he noted in her medical records, concluding that she has "good days and bad days." (Id.) However, it appears from the Records that Harris neither sought nor obtained any further treatment for her depression and anxiety after February 1994, nearly two years before her death.

Even after reviewing the Records, Dr. Thompson, the State's expert, refused to change his opinion as to homicide because he based it on the extrinsic evidence that suggested to him that Harris was murdered. (MAR Tr. at 1223-24). He did admit that Harris could have tied the knot in the bag herself. (Id. at 1244.) However, at best he would have "considered" suicide but would not have adopted it as an opinion.

Dr. Hudson, the former chief medical examiner of North Carolina, opined only that the evidence "is *consistent with* Ms. Harris having made a successful suicide attempt." (Id. at 227 (emphasis added).) He did not, and apparently could not, opine that he believed that Harris had in fact committed suicide. Similarly, Dr. Coleman conceded that she could not say "with any degree of certainty" that Harris was suicidal. (Id. at 727.)

Scanlon's strongest witness is Dr. Levy, a forensic pathologist with similar training and credentials as Dr. Thompson, who at the MAR Hearing testified on direct that he saw suicide as the "most likely" manner of death. (Id. at 133.)

This is contrasted with his report, where he stated only that the evidence "makes me lean towards a suicide" (MAR Hearing, Def.'s Ex. 3 at 5), and his MAR cross-examination, where when asked if he favored "suicide" over "undetermined" stated it was "a very complex case" and "I don't have any problem with undetermined. There are features of virtually every single manner of death in this case, and undetermined is, to use a term I've recently used, a path of least resistance, for sure, yes." (MAR Tr. at 194.) He based his opinion on his view that there was a lack of any definite defensive injury which may be found in cases of strangulation, apparently dismissing Harris' black eye.[13] (Id. at 143.) Contrary to Dr. Harris' testimony, Dr. Levy also testified that Harris could have placed the bag over her head herself. (Id. at 141.)

In this court's view, the Records and MAR experts, particularly Dr. Levy, would have provided meaningful support for a suicide defense and/or an "undetermined" defense. However, in light of the trial evidence, it is a particularly close question whether the Records and testimony, had they been presented, undermine confidence in the outcome. The court

---

[13]   Dr. Thompson testified that the bruise on Harris' face could have been caused by a fist and might have occurred around the time of her death. (Trial Tr. at 2690, 3905-09.) Slight bruising was also found on Harris' forearm, as well as two small lines on her neck likely caused by the plastic bag. (Id. at 2668.) Scanlon's experts at the MAR Hearing disagreed and did not see any evidence of defensive injuries. (MAR Tr. at 143.)

concludes that in a criminal case where the prosecution bears the burden of proof beyond a reasonable doubt and a defendant need only raise reasonable doubt, had the jury considered an accurate portrayal of Harris' heart condition and the evidence of her mental health condition supporting a suicide defense, "there is a reasonable probability that at least one juror would have struck a different balance" by finding either "suicide" or "undetermined" as the manner of death. See Wiggins, 539 U.S. at 537.

### 4. Determination of Whether State Court Decision Constituted an Unreasonable Application of Clearly Established Federal Law.

This does not end the inquiry, however. In order to grant a habeas petition under section 2254(d)(1), the state court must have unreasonably applied clearly established federal law as set forth by the Supreme Court. Though this court has concluded that the North Carolina Court of Appeals incorrectly applied Strickland, this incorrect application must be "objectively unreasonable" in order to grant Scanlon's habeas petition. Id. at 520-21. The term "objectively unreasonable" is difficult to define, and courts have struggled to apply it.[14] The Supreme

---

[14] In its attempt to formulate a general definition of "objective unreasonableness," the Second Circuit noted:

> As an abstract proposition, we can only echo Justice O'Connor's virtually tautological statement [in Williams v. Taylor] that to permit habeas relief under the "unreasonable application" phrase, a state court decision

Court has offered some examples as to what constitutes "objective unreasonableness": the Court has found "objective unreasonableness" when a state court committed a clear factual error, id. at 528, uncritically deferred to an individual's assertion rather than rigorously scrutinizing the validity of that contention, e.g., id. at 526-28, and failed to give appropriate consideration and weight to pertinent facts, Rompilla, 545 U.S. at 389 (finding that state court's conclusion that trial counsel could reasonably decline to make an effort to review an easily assessable file he knows the prosecutor will cull for evidence was an objectively unreasonable application of federal law).

The Supreme Court has declined to find "objective unreasonableness" in cases where the support for the state court's analysis and conclusions are so strong that, while the federal court may disagree, it must acknowledge "at the very least that the state court's contrary assessment was not 'unreasonable'" and that "federal-court intervention" would be tantamount to "substitut[ing] [the federal court's] own judgment

must be not only erroneous but also unreasonable. Some increment of incorrectness beyond error is required. We caution, however, that the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence. We do not believe AEDPA restricted federal habeas corpus to that extent.

Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (citation omitted) (internal quotation marks omitted).

for that of the state court." <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25-27 (2002) (per curiam). In assessing the reasonableness of a state court's application of federal law, a federal court is to review the state court result, not "whether [its decision] [was] well reasoned."[15] <u>Wilson</u>, 352 F.3d at 855 (quoting <u>Bell v. Jarvis</u>, 236 F.3d 149, 159 (4th Cir. 2000) (en banc)).

In applying <u>Strickland</u> to Scanlon's ineffective assistance of counsel claim, the North Carolina Court of Appeals concluded that competent evidence supported the trial court's conclusion that Trial Counsel's failure to utilize the Records did not fall below an objective standard of reasonableness. <u>Scanlon</u>, 176 N.C. App. at 441, 626 S.E.2d at 790. The court of appeals reasoned that Trial Counsel had obtained and reviewed Harris' medical records (including putting post-it notes on them) and consulted Dr. Thompson and Dr. Hilkey about the possibility of a suicide or heart-related defense, which showed a reasonably sufficient investigation into this particular line of defense. <u>Id.</u> at 440, 626 S.E.2d at 790. As to prejudice, it concluded

---

[15] However, most courts still review the reasoning employed by the state court. <u>See</u> <u>Allen v. Lee</u>, 366 F.3d 319, 343 n.3 (4th Cir. 2004) (en banc) (Gregory, J., concurring) (representing views of majority of en banc circuit) ("Having found that the *analysis* employed by the state court was unreasonable, we could not properly deny relief under § 2254(d) on the basis that the *result* of the state court proceeding was not unreasonable. Such a conclusion would necessarily be premised on reasoning that was *not* relied on by the state court. Reasoning that the state court could have — but did not — employ must be evaluated *de novo*, without applying the deferential standard prescribed by § 2254(d)(1).").

that the severity of Harris' heart condition was "substantially
before the jury" and thus the Records would not have bolstered
the defense that she died as a result of her heart condition.
Id. The court of appeals reasoned that even if Trial Counsel's
actions were objectively unreasonable, Scanlon was not
prejudiced because Trial Counsel's decision to pursue a theory
of autoerotic asphyxiation or accident instead of suicide was a
defensive strategy that could not be second-guessed on appeal.
Id. at 442, 626 S.E.2d at 791.

As to the first prong of Strickland, whether Trial
Counsel's performance fell below the proper standard, the court
finds that the North Carolina Court of Appeals' application of
Strickland to the facts of the case is an objectively
unreasonable application of federal law as determined by the
Supreme Court. The court of appeals failed to show the
reasonableness of Trial Counsel's failure to conduct a more
thorough investigation into the cause and manner of death,
including a possible suicide defense. In Wiggins, the Supreme
Court noted that the failure by the state court to conduct an
assessment of whether counsel's decision not to further
investigate available mitigating evidence actually demonstrated
reasonable judgment reflected an unreasonable application of
Strickland. 539 U.S. at 527-28 (noting that "the [state]
court's subsequent deference to counsel's strategic decision not

to present every conceivable mitigation defense, despite the fact that counsel based this alleged choice on what we have made clear was an unreasonable investigation, was also objectively unreasonable") (citation omitted) (internal quotation marks omitted).

Here, the court of appeals reasoned that the investigation was adequate based on Trial Counsel's discussion with Drs. Thompson & Rudner (the State's witnesses), Dr. Hilkey (a psychologist), and counsel's review of the medical records. Without discussing the medical case and possible suicide defense with any independent medical expert, however, by failing to provide the Records to the State's medical experts when discussing the possibility of suicide, and by failing to pursue production of Harris' psychiatric records when the medical records clearly indicated she was receiving psychiatric treatment in 1993, Trial Counsel's investigation fell below what reasonable professional judgment would support. Had Trial Counsel obtained the psychiatric records, for example, they would have noted Harris' 1993 crying spells, night sweats, and comment that she "wishe[d] to be dead."[16]

---

[16] And though the court need not rely on the state court's analysis, it is apparent that it was faulty: the court of appeals approved the trial court's conclusion that the Records were unnecessary insofar as Trial Counsel had decided not to pursue a suicide defense. The problem, of course, is that Trial Counsel did offer (only weakly) the possibility of suicide to the jury and their decision not to use the Records was based on a failure to properly investigate them.

The court of appeals also held in the alternative that even if Trial Counsel's performance was objectively unreasonable, Scanlon was not prejudiced by such a failure. Scanlon, 176 N.C. App. at 442, 626 S.E.2d at 791. It noted that the trial court's finding of no prejudice was "clearly supported by competent evidence of record" which "adequately support[s] the trial court's conclusion of law." Id.

While this court may have reached a different decision, it cannot say on this record that the North Carolina Court of Appeals' conclusion that Trial Counsel's failures did not prejudice Scanlon was unreasonable under Strickland. As noted earlier, there was significant evidence of Scanlon's guilt that would not have been controverted by the use of the Records at trial, including the fact that Scanlon had a key to Harris' residence, his presence in her house at the time of her murder, his theft of her belongings, his pawning of a ring in Durham at 4:12 p.m. on February 26, 1996, which matched that of Harris' nephew who lived with her, his pubic hair found on Harris' bed and DNA found on a cigarette butt, and his flight with her belongings. Important on the issue of manner of death, Harris had filed incident reports with the Durham Police Department against Scanlon for his check and credit-card fraud, Harris had fired a shot at Scanlon previously, Scanlon had threatened to kill Harris, out of fear for Scanlon Harris was arranging to

have her locks changed and had her nephew move in with her three weeks before her death, and Harris had signs of a potential altercation -- a black eye and bruise -- at the time of her death. This evidence carries significant weight considering that Scanlon denied that he was present at Harris' house at the time of her death and presented a defense of alibi. While the court of appeals' decision as to prejudice is short on analysis, when "assessing the reasonableness of the state court's application of federal law, the federal courts are to review the result that the state court reached, not whether [its decision] [was] well reasoned." Wilson, 352 F.3d at 855. Given the trial evidence, this court cannot say that the court of appeals' decision that Scanlon failed to demonstrate that, absent Trial Counsel's errors, "the outcome of the proceeding would have been different" was unreasonable. Lawrence v. Branker, 517 F.3d 700, 709 (4th Cir. 2008), cert. denied, 129 S. Ct. 162 (2008).

The court finds, therefore, that considering the evidence presented at trial to support Scanlon's guilt as to the murder conviction, when weighed in light of the MAR evidence, the court of appeals' decision that Scanlon was not prejudiced was not objectively unreasonable. See, e.g., Powell v. Kelly, 562 F.3d 656, 669 (4th Cir. 2009) (holding that the state court's analysis was not objectively unreasonable when it found that Strickland's prejudice prong was not satisfied because the court

listed all the evidence presented to the jury that supported its finding).

## III. CONCLUSION

The court has carefully reviewed those portions of the Report and Recommendation of the United States Magistrate Judge to which objections were made and has made a *de novo* determination. The court's determination is in accord with the Recommendation, except as explained herein, and the Recommendation is adopted as modified by the reasons set forth herein.

IT IS THEREFORE ORDERED that the State's motion for summary judgment (Doc. 10) be GRANTED, Scanlon's motion for summary judgment (Doc. 17) be DENIED, and the petition (Doc. 1) be DENIED.

As reflected by the court's analysis, the court finds that Scanlon has made a sufficiently substantial showing of the denial of a constitutional right with respect to the issue of prejudice under <u>Strickland</u> relating to Trial Counsel's failure to use the Records to warrant granting a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2).

IT IS FURTHER ORDERED that a certificate of appealability is issued on the question whether, as to his claim for ineffective assistance of counsel, Scanlon was prejudiced by Trial Counsel's failure to use the Records and the expert

testimony therefrom in attempting to establish reasonable doubt as to whether he was guilty of the murder of Harris.  <u>See</u> 28 U.S.C. § 2253(c)(3).

A Judgment will be entered contemporaneously with this Order.

<u>   /s/ Thomas D. Schroeder   </u><br>
United States District Judge

September 30, 2010